THE SHEPARD LAND COMPANY *vs.* EMMA T. BANIGAN, EXECUTRIX.

JULY 12, 1913.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1) *Appeal and Error.*

Under Gen. Laws, cap. 285, § 3, providing that no judgment or other proceeding in civil cases in any court shall be reversed for any defect or want of form, but the court shall proceed and give judgment according as the right of the cause shall appear, and cap. 298, § 24, providing that exceptions to decisions or rulings prior to trial shall be open to revision after verdict or final decision on the merits, but so far only as it appears to the Supreme Court that the verdict or final decision was erroneously affected thereby, exceptions to the action of the court in sustaining a declaration which although technically defective was amendable, and in sustaining replications setting out issues which should have been raised by amendment of the declaration, will be overruled.

*(2)   Principal and Surety.   Discharge of Surety.*

Where the name of a surety is removed from a bond after its execution, co-sureties who did not know or consent to the removal, will not be bound, but such as knew or consented to the removal would remain bound.

*(3)   Principal and Surety.*

Although all the sureties on a bond are released by the removal of the name of one of the sureties after its execution, without the consent of the others, the bond is not null and void, but remains binding upon the principal.

*(4)   Principal and Surety.*

Where one executed a guaranty of a bond, which in turn secured a lease, knowing that the name of one of the sureties had been erased from the bond, after signing, but before delivery, the fact that the guarantor did not know that the erasure had been made without the knowledge of the other sureties on the bond, and that he did not know that his co-sureties on the guaranty were also unaware of the removal of the name of the surety from the bond, did not relieve the guarantor of liability under the guaranty, since he should have ascertained the facts before signing as to all the circumstances of the erasure.

*(5)   Principal and Surety.*

An obligee is not under the duty of investigating to learn whether the removal of a surety's name has been consented to by the other sureties, but a surety must make any necessary investigation for himself.

*(6)   Principal and Surety.*

The fact that the principal practiced fraud upon any of the sureties, in the case at bar, either on the bond or guaranty to obtain their signatures, would not be a defence if the obligee was not privy to it.

*(7)   Leases.   Construction.*

Under a lease the lessor covenanted to make certain alterations which were to be paid for by lessee in annual instalments, the first to be paid May 31, 1901.   This lease dated June 1, 1900, was not executed until November 27, 1900, and was not delivered until about January 5, 1901, upon the making of a contract for the improvements which were to be completed by September 1, 1901.   This delay was owing chiefly to inability of lessee to give the security for payment of the rent.   The guarantor claimed that by lessor entering into the contract for the improvements requiring their completion during the fall of 1901, he changed the obligation of lessee to pay the first instalment May 31, 1901, as guaranteed and thus released guarantor:—

*Held,* that the lease was to be construed in the light of all the circumstances shown to exist at the time of its going into effect by delivery, and according to the construction then put upon it by the parties to it and by the guarantor so far as is permissible under the rule of construction applicable thereto.

*(8)   Guaranty.   Discharge of Surety.*

A material alteration in the original contract by the parties thereto without consent of the surety or guarantor will release the surety or guarantor.

*(9)  Guaranty.  Discharge of Surety.*

Where a contract is divisible, as where successive payments are to be made, at fixed periods, if the creditor gives time as to one of such payments he will relieve the surety with regard to that payment only, but not with regard to the subsequent payments.

*(10)  Guaranty.  Discharge of Surety.*

A modification of the principal contract even after a guaranty has been given and accepted does not release the guarantor if made with his consent.

*(11)  Guaranty.*

The fact that the consent of a guarantor is given to the modification of the original contract may be shown by circumstantial evidence. Tacit acquiescence is enough.

*(12)  Guaranty.*

Where a lease provided that lessor should make certain alterations which were to be paid for by lessee in instalments at stated periods, but the delivery of the lease was delayed for about seven months owing to inability of lessee to furnish satisfactory surety, and the guarantor while the lease, bond, and guaranty were being held in escrow saw them and was consulted about the contract for alterations, suggested bidders, knew that a certain bidder had obtained the contract and permitted the delivery of his guaranty simultaneously with the delivery of the lease, bond, and contract as part of one transaction, a change in terms of payment under the lease which might be necessitated by the above facts of which guarantor had notice would not be a defence under the guaranty.

*(13)  Guaranty.*

Where on the above facts guarantor knew that lessor would not have delivered the lease without his guaranty and that he relied upon him and not upon his co-guarantors and that upon the execution of the guaranty lessor entered into a contract for alterations at great expense, he is equitably estopped to set up the defence that there was an alteration of the risk, by a change in the terms of payment for such alterations, owing to the delay in the delivery of the lease.

*(14)  Landlord and Tenant.  Waiver.  Guaranty.*

Where a lease provided for the making of alterations by the lessor to be paid for by lessee in stated instalments, the action of lessor in entering into a contract which would necessarily extend the completion of the improvements beyond the date fixed for payment of the first instalment amounted to a waiver by lessor of one of the terms of the lease, within the meaning of a provision of the bond securing the lease, that waiver by lessor of any breach of covenant in the lease should in no way impair the bond.

*(15)  Landlord and Tenant.  Waiver.*

Waiver of a provision of a lease may be shown by conduct inconsistent with its enforcement.

*(16)   Courts.*

The interpretation placed by the Superior Court upon a lease in sustaining a demurrer to a fifth replication, which action was not excepted to, is not binding either upon the Superior Court at the trial upon the issues of the case as they then stand nor upon the Supreme Court upon review.   Such decision upon the demurrer as it was not excepted to eliminated such replication and the issue attempted to be raised by it from the record, but the appellate court is not bound by the reasons stated by the lower court for reaching said decision.

*(17)   Landlord and Tenant.   Construction of Lease.*

Where a payment due by lessee on account of alterations to be made by lessor was postponed on account of the fact that owing to delay in delivery of the lease the alterations had not been made at the time for payment and no other time for payment was ever agreed upon, the payment of the instalments was not released, but was simply deferred and would become due in a reasonable time after completion of the work and in determining the question of reasonable time it is proper to consider what time after occupancy of the property was originally intended to be allowed lessee to make such payments and to consider any changes in the condition or circumstances of the parties, known to both which could affect it.

*(18)   Landlord and Tenant.*

Where under a lease lessee was in arrears for rent and interest, as well as for instalments due for alterations, but the payment of the latter instalments had been deferred until a reasonable time after the completion of the alterations, the fact that lessee made certain payments, upon presentation of the bills for such instalments before a reasonable time, protesting that he had not been given sufficient time for payment, was not a recognition by him that such instalments were due when he made the payments on account, where the rent and interest alone exceeded the amount of the payments made by him.

COVENANT.   Heard on exceptions of defendant and sustained.

BAKER, J.   This is an action of covenant brought against the defendant as executrix of the will of William B. Banigan to recover damages for the breach of a guaranty under seal, dated November 27, 1900, and executed by James E. Johnson as principal and by William B. Banigan, Walter Brett and Richard Lalor as sureties.   In this guaranty it is recited that the plaintiff had executed a certain indenture of lease to James E. Johnson, a copy of which was annexed to the guaranty, and that said Johnson, as principal, and M. R. Downey, H. H. Franklin, Charles A. Franklin, W. H.

Morgan, H. B. Winship and R. W. Burnham, as sureties, had given their written obligation, a copy of which was annexed to the guaranty in the sum of fifty thousand dollars ($50,000) for the payment of all rents covenanted to be paid in and under said lease.   Then by the terms of said guaranty the obligors therein named, in consideration of the execution of said lease by said plaintiff to said Johnson and in further consideration of the sum of one dollar ($1.00) to each of them paid by the plaintiff, jointly and severally, guaranteed the payment within ninety days of the time when the same should become due and payable of all sums that might become due and payable to the plaintiff under and by virtue of the written obligation aforesaid, provided that their liability on said guaranty should in no case exceed the sum of twenty-five thousand dollars ($25,000).

The instrument referred to in the guaranty as the "written obligation" of James E. Johnson as principal and the others named therein as sureties is a bond to the plaintiff in the penal sum of fifty thousand ($50,000), signed and sealed by them, and conditioned upon the payment by James E. Johnson, his executors, administrators and assigns of "all the rent reserved, agreed and covenanted by him to be paid in and under any of the provisions in said lease contained." The bond also contains this provision: "and the waiver of any breach of any covenant in said lease contained in any case by the said The Shepard Land Company or its assigns shall in no way impair this obligation." The bond recites that said James E. Johnson has entered into with the plaintiff an indenture of lease of the building known as the Providence Athletic Association Building, dated June 1st, A. D. 1900, and that a copy of said lease is attached to the bond.

Said indenture of lease between the plaintiff and said Johnson is a long instrument and it is not necessary for the purposes of this case to quote it in full.   It bears date of June 1, 1900, and was acknowledged by John Shepard, Jr., as treasurer of the plaintiff company in its name and behalf

on the 27th day of November, 1900. By it the plaintiff demised and leased to said James E. Johnson "that estate situate in said City of Providence, with the building thereon known as the Providence Athletic Association Building" a description of which estate by metes and bounds is given in said lease, for "the term of fifteen (15) years, commencing the first day of June, A. D. 1900, and ending on the 31st day of May, A. D. 1915."

By clause (1) of the "third" paragraph of said lease, the plaintiff for itself and its assigns covenanted with said lessee as follows: "that it will and they shall expend sufficient money for the alteration and improvement of the building on said demised premises so as to put the same in good condition for a first class hotel, according to the plans and, so far as the same may extend, according to the general specifications prepared by Frederick Pope, architect, 622 Tremont Building, Boston, Mass., which plans and general specifications have been signed by the parties hereto for identification." The amount to be expended by the plaintiff under this clause was to be known and referred to as the "Improvement Fund."

By clause (2) of said "third" paragraph the plaintiff covenanted and agreed to "purchase furniture, carpets and bed springs necessary for the equipment and furnishing of said hotel . . . of such character, quality and kinds as shall be suitable for a first-class hotel." The cost of said furniture, carpets and bed springs in no event to exceed forty-five thousand dollars ($45,000). They were to be delivered and placed in said hotel by the plaintiff as soon as said improvements and alterations had been completed, and were to be purchased at such time as might be agreed upon by the parties to the lease. The amount to be expended by the plaintiff under this clause (2) was to be known and referred to as the "Furniture Fund."

The said lessee by the "first" paragraph of said lease covenanted for himself, his executor, administrator and assigns that he and they should pay "as and for rent of said

demised premises, all the amounts specified at the times and
in the manner specified in the clauses lettered 'a,' 'b,' and
'c' " of those paragraphs.

By clause (a) aforesaid the lessee was to pay for the period
of five (5) years from June 1, 1900, the sum of one thousand
dollars ($1,000) each on the last business day of each and
every calendar month, provided that the monthly amounts
that should accrue from said June 1, 1900, to such time as the
improvements and alterations aforesaid should be completed
and the building on said demised premises be ready for
occupancy should be paid in fifteen equal instalments
the first to be paid May 31st, A. D. 1901, and thereafter-
wards one instalment on the 31st day of May in each and
every year until said amount is paid.   By a proviso in said
clause (1) of said "third" paragraph the plaintiff was to
rebate such sums as were payable under said clause (a) of
said "first" paragraph from November 1, 1900, to such time
as said improvements and alterations should be completed
and said building be ready for occupancy.   The amount of
the monthly payments for rent after the first five years of the
lease were to be agreed upon by the parties or on their
failing to agree by arbitration.

By clause (b) of the "first" paragraph of the said lease the
lessee was to pay for fifteen years, beginning with May 31,
1901, on May 31st of each year one-fifteenth of the "Im-
provement Fund," provided that if said fund should exceed
$50,000 only one-fifteenth of $50,000 should be so payable,
annually, the excess over $50,000 being payable in Twelve
equal annual instalments, beginning May 31, 1904.   By
this clause (b) interest on the "Improvement Fund" at the
rate of six per cent. per annum from the dates of payment of
the expenditures included in that fund to the time when the
improvements and alterations should be completed and the
building be ready for occupancy, was to be paid by the lessee
at that time and after that time the interest on this fund on
the unpaid balance thereof was to be paid monthly on the
last business day of each calendar month.

By clause (c) of said "first" paragraph of said lease the lessee was to pay for ten (10) years on the 31st day of May, beginning with May 31, 1901, one-tenth of the "Furniture Fund" and was to pay interest on that fund or the unpaid balance thereof at the rate of six per cent. per annum, to be reckoned from the time of the payment of any money for the purchase of furniture, carpets and bed springs, the final payment to be made at the time when the improvements and alterations should be completed and the building be ready for occupancy and thereafterwards on the last business day of each and every calendar month.

The "second" paragraph of said lease provides "that if default shall be made in the payment of any of the amounts hereinbefore covenanted and agreed to be paid" by said lessee "or default shall be made in any part of them" or any. other default in respect of any of the covenants of the lease should be made by the lessee, and such default should continue for thirty (30) days after demand for payment or performance, whether the demand should be made upon the day and upon the premises or not, then it should be lawful for the lessor thereupon or at any time thereafter so long as such default should continue and with or without process of law to re-enter upon said demised premises and to terminate said lease, without prejudice, however, to any claim for damages or right of action or remedy which it might otherwise have or use for breach of such covenants or agreements.

The lease also contained the covenant by the lessee that he would not assign said lease or underlet said premises without the previous consent in writing of the lessor.

The plaintiff in its declaration sets out the making of said lease and makes profert thereof and among other things in substance recites the covenants of said lease hereinbefore recited. It also avers the making of said bond of which it makes profert, and sets it out substantially if not verbatim. It then alleges the giving of the guaranty sued on, of which it makes profert, and in substance sets out. It also avers that at various and sundry times between the 1st day of

June, A. D. 1900, and the 12th day of October, 1901, it, the lessor, expended money for the improvements and alterations of the building on said demised premises according to the plans and specifications referred to in said lease and did put said building into good condition for a first-class hotel according to said plans and specifications, expending for the purpose a large sum of money, to wit, the sum of $105,171.38 and at the time agreed upon between the parties to said lease, purchased furniture, carpets and bed springs for the furnishing of said hotel, as agreed upon, expending therefor a large sum of money, to wit, the sum of $27,589.68 and placed the same in said hotel as soon as said improvements and alterations were completed and prior to said 12th day of October, 1901, and that it performed all the other covenants contained in the lease by it to be performed. It also avers that said Johnson on said 12th day of October, 1901, under and by virtue of said lease entered into possession of said demised premises and was possessed thereof until February 13, 1902, when a large sum of money, to wit, the sum of twelve thousand five hundred dollars ($12,500) of the rent accrued under said lease was due and payable from said Johnson to the plaintiff and was in arrears and unpaid; that thereunder and by virtue of the bond, this large sum of money was due and payable to the plaintiff from the obligors named in said bond, and remained due and unpaid for more than ninety (90) days; and that thereafter, to wit, on the 14th day of May, 1902, the said sum of twelve thousand and five hundred dollars ($12,500) became and was due and payable to the plaintiff from the defendant as executrix of the will of the said William B. Banigan, and from his co-guarantors, jointly and severally, under and by virtue of said guaranty, and remained due and unpaid when this action was brought. The refusal of the defendant as said executrix to pay the sum last above mentioned is alleged as the breach of the covenant of the said William B. Banigan contained in said guaranty.

The defendant's first plea alleges that said bond is not the deed of James E. Johnson or of any of the persons named

therein as sureties, and that the guaranty is not the deed of said Johnson or of any of the persons named therein as sureties.

The second plea alleges that the bond was signed and sealed not only by the persons declared on, but also by one Fred S. Farwell, and that after it had been so signed and sealed and before the delivery of the guaranty, the name and seal of said Farwell were by him erased and removed without the knowledge and consent of his co-obligors and of the said William B. Banigan, whereby said bond was avoided and annulled as to all parties thereto; and that thereafter no liability did or could arise under the guaranty.

The third plea alleges the same facts as the second and avers that by reason whereof said guaranty was performed.

The fourth plea is an equitable plea under the statute. It alleges the same facts as to the erasure of Farwell's name and seal from the bond and states that they were well known to the plaintiff and were unknown to said William B. Banigan. It further alleges that said Banigan at the special request of the plaintiff and in these circumstances, signed, sealed and delivered the guaranty without knowing or being informed of the invalidity of said bond, and prays judgment, if the plaintiff ought to maintain this action because neither the defendant nor the plaintiff has any remedy over against the signers and sealers of said bond and because "it is evident injustice for one party to allow another to enter into a contract which the former knows or is bound to know is invalid."

The pleading which followed was prolonged and complicated and it is unnecessary to set it out in full. The plaintiff at first filed six replications. The fourth replication set up that the erasure on the bond was made prior to the execution of the guaranty and prior to the delivery of the bond and that Banigan signed, sealed and delivered the guaranty with full knowledge of the erasure and of the circumstances thereof. To this replication the defendant demurred, but the demurrer was overruled. By its fifth

replication the plaintiff set up the existence of certain facts and certain conduct of Banigan whereby he was estopped from denying his liability on the guaranty. To this replication the defendant demurred and the demurrer was sustained. Thereafter by leave of the court the plaintiff filed an additional replication, setting up the placing of the lease, bond and guaranty in escrow until a certain condition was fulfilled, the delivery of said instruments in January, 1901, the understanding of the parties to the lease and Banigan that the payments due under the lease on May 31, 1901, were deferred, and certain conduct of Banigan whereby it was claimed he was estopped to deny liability. The defendant demurred to this replication, but the demurrer was overruled. There was also a demurrer on formal grounds to a surrejoinder which was overruled. Finally on April 17, 1912, by leave of the court, the plaintiff filed an equitable replication setting out in substance the facts as claimed by the plaintiff and claiming therefrom the same benefit it would have in a court in equity. The defendant on April 22, 1912, moved to strike out such equitable replication and on May 4, 1912, joined issue on said "equitable replication," but under a stipulation that by so doing she should "not in any manner prejudice her right to be heard upon argument in support of the motion to strike out said replication nor upon the points of law or legal rights in said motion involved." To the overruling of three (3) of her demurrers, to the denial of her motion for judgment on the sustaining of her demurrer to the fifth replication, to the granting of the plaintiff's motion on a reargument on this last mentioned demurrer, to the court's allowing the filing of said seventh replication, the defendant in each instance excepted and includes such exceptions in her bill of exceptions, being the first six exceptions therein.

The case was tried before the Presiding Justice of the Superior Court without a jury, who on the tenth day of June, 1912, rendered a decision in favor of the plaintiff for $11,726.81 and costs to which decision the defendant

·excepted. On June 11, 1912, the Presiding Justice filed a rescript saying that in the decision of the day before it was his "intention to include legal interest from the date of the plaintiff's writ in addition to the sum of $11,726.81." To this ruling and decision the defendant duly excepted. In the course of the trial the defendant took numerous exceptions to the admission of evidence, which are included in her bill of exceptions, which contains one hundred and twenty-two exceptions, although some were not pressed at the hearing before this court. The plaintiff also excepted to the said decision of June 10, 1912, because it did not specifically include interest and has filed its bill of exceptions, which contains that exception only, so that the case has been heard on both bills of exceptions.

There is little, if any, dispute in the evidence as to the material facts of the case. In the spring of 1900 the plaintiff corporation was the owner of the estate described in said lease. John Shepard, Jr., and Walter A. Peck were then the only stockholders in the corporation, each owning half thereof, although it appears that shortly after George Shepley was a stockholder. Mr. Shepard was treasurer of the corporation and the management of its affairs was practically in his hands. James E. Johnson during that spring negotiated with the plaintiff relative to the hiring of said premises for use as a hotel for a considerable term of years, provided that the plaintiff would add two stories to the building as it then was and would otherwise alter it so that it would be suitable for use as a first-class hotel, and would supply it with furniture to properly equip it for such use. As the result of said negotiations the lease in evidence was drawn and finally agreed upon by the parties thereto. As part of the arrangement it was understood by and between the parties that it was not to go into effect until Mr. Johnson had given to the plaintiff a bond satisfactory to it, and contracts approved by Mr. Johnson had been made for the contemplated improvements and alterations. In pursuance of this arrangement, Richard B. Comstock, Esq., the attorney

of the plaintiff, drew up the bond in evidence and delivered the same to Mr. Johnson to procure his sureties and have it executed. No names of sureties were then written in the bond as it was not then known who they would be. Both the lease and the bond were dated June 1, 1900. Mr. Johnson procured the signatures now on the bond and also the signature of Mr. Fred S. Farwell. When Mr. Comstock was informed that Mr. Farwell had signed the bond, he told Mr. Johnson that the bond was satisfactory. Shortly after Mr. Farwell had signed the bond he caused his name to be removed therefrom. Upon plaintiff's counsel being informed that Mr. Farwell's name had been removed from the bond, Mr. Johnson was informed that the bond without Farwell's name was not satisfactory and would not be accepted and that some additional surety as good as Mr. Farwell must be obtained. Mr. William B. Banigan's name was mentioned and it appears that he was asked to go on the bond after being informed that Mr. Farwell had removed his signature therefrom, but Mr. Banigan declined to sign the bond. There is a difference in the testimony of Mr. Comstock and Mr. Johnson on a point perhaps not very important in itself. Mr. Comstock says that the bond was brought to him in its present condition by Mr. Johnson on July 11, 1900, on which day Johnson signed the lease. The latter says that after Mr. Farwell signed he procured the signature of Mr. Burnham and in that condition gave the bond to Mr. Comstock; but that shortly after he took the bond back in order to permit Mr. Farwell to have his name removed therefrom and after that was done returned it to Mr. Comstock. It appears that Mr. Johnson was unable after Mr. Farwell removed his name to find any other person of satisfactory financial ability to go on the bond as surety. As a result the negotiations and the entire transaction for the time being came to a standstill through the inability of Mr. Johnson to give the bond required. This is shown by the letters of Edwards & Angell, as counsel for Mr. Johnson, of September 1, 1900, to Mr. Shepard and Mr. Comstock

(defendant's exhibits J and K), in which it is requested that the bond be returned if the plaintiff is unwilling to negotiate further; at the same time saying in the letter to Mr. Shepard that "if the only obstacle to progress of negotiations is suretyship on the bond, this can probably be made satisfactory to you." Mr. Shepard was absent from Providence in Connecticut during July and August and a part of September, 1900. Upon his return the negotiations were again taken up. It appears that Mr. Shepard first made the suggestion to Mr. Johnson that Mr. Banigan guarantee the bond. This Mr. Banigan agreed to do, and under date of October 2, 1900, Messrs. Edwards & Angell informed the counsel for the plaintiff that Mr. Banigan had that day executed a guaranty for the payment of one-seventh of all sums that might become due and payable upon the bond offered by Johnson to the plaintiff. (Defendant's Exhibit L.) This guaranty was rejected. Afterwards about November 1, 1900, Mr. Comstock at the request of Mr. Johnson drew a guaranty for Mr. Banigan to sign for $25,000. The form of the guaranty was returned by Mr. Johnson, objected to by Edwards & Angell on the ground that it might make Mr. Banigan liable up to $50,000, with a substitute drawn by Stephen O. Edwards, Esq., which was accepted as satisfactory in form by Mr. Comstock and is the guaranty sued upon. Mr. Johnson testified that Mr. Banigan agreed to go on the guaranty if he, Johnson, would get two other names thereon, but that he was not to ask any Providence men to go thereon. Mr. Johnson then went to New York and obtained the signatures of Lalor and Brett. Mr. Banigan signed the guaranty, the lease, bond and guaranty when they were all attached together. On November 27, 1900, Mr. Johnson took the papers to Mr. Comstock. At Mr. Comstock's direction the names of the sureties were written in the body of the bond and thereupon Mr. Johnson signed the bond and guaranty as principal in each instance. They then went to Mr. Shepard's office and the lease was executed in duplicate by him for the Shepard Land Com-

pany.  Mr. Stephen O. Edwards was present.  By agreement the two duplicate originals of the lease, and the bond and guaranty were then left in the hands of Mr. Comstock to be held by him until the contracts for improvements and alterations were made with Mr. Johnson's approval, when the lease, bond and guaranty were to be delivered.  Early in January, 1901, on or about the 5th, a contract with Mack & Moore for the principal improvements and alterations called for by the plans and general specifications referred to in the "third" paragraph of said lease was signed by them and by the plaintiff and the same was approved by Mr. Johnson in writing.  By this contract the work covered by it was to be completed by September 1, 1901, and the plaintiff was to pay for it the sum of $90,000.  Upon the signing of the Mack & Moore contract the bond and guaranty and one duplicate original of the lease were delivered to the lesssor, and the other duplicate original of the lease was delivered to the lessee.  The work under the Mack & Moore contract was promptly begun.  It does not appear when it was completed beyond this, that on October 12, 1901, the work under this contract, extra work done by them, and other work performed by other contractors such as decorating and papering, instaling of light fixtures and ranges and laying of sidewalks, the purchasing and placing of furniture in the building as called for by the lease were then all completed.  Mr. Johnson took possession under the lease on that date and testified that at that time the plaintiff had performed what was to be performed by it under the lease to that time.  In addition to what is already stated, it appears that Mr. Johnson had interested Mr. Banigan in his plan to hire this hotel property. Mr. Banigan expressed his faith in Mr. Johnson's ability to succeed and had agreed to furnish him with capital to the extent of $20,000 to assist him in opening up the business. Mr. Johnson says he saw Mr. Banigan very frequently and after the signing of the lease, bond and guaranty, at the latter's office; that Mr. Banigan saw the plans the same as himself, that they talked over together the alterations of the

hotel and the plans a number of times until the papers were finally signed; he talked with Mr. Banigan about the cost of the work under the contract for the alterations; Mr. Banigan suggested one or two contractors to be seen to make bids thereon; he told Mr. Banigan that Mack & Moore's bid was the lowest bid, stated the time the contract was to be completed, and showed him the contract. Mr. Banigan was informed as to the acceptance and signing of the Mack & Moore contract.

On October 31, 1901, a bill was rendered to Johnson for $8,983.31 as due under the lease. On November 30, 1901, a second bill was rendered for $10,615.42. On December 3, 1901, Johnson paid $1,000 on account. On December 31, 1901, a third bill for a balance of $11,248.76 was rendered. On January 3rd and January 15th, 1902, payment of $1,000 each was made on account. On January 31, 1902, a fourth bill was rendered for $10,882.41. On January 15, 1902, Johnson made a general assignment for the benefit of his creditors. On February 13, 1902, the plaintiff dispossessed Mr. Johnson for default of more than thirty days in the payment of rent according to the terms of the lease, and notice of such default was given the sureties; the amount then claimed to be due being $11,621.29. More than ninety days after, on August 4, 1902, this action was commenced.

(1)    As already stated, the first six of the defendant's exceptions were exceptions to decisions and rulings prior to trial. In strictness, perhaps, some of the issues raised by replication should have been by amendment of the declaration. It is apparent, however, that the case has been fully tried upon its merits upon the issues raised. Assuming, without deciding that there was a technical defect in the declaration, it was amendable, and it does not appear that the defendant has been in any way harmed thereby. For cases where amendment of a declaration after verdict or final decision was permitted see *Spicers* v. *Harvey*, 9 R. I. 582; *Prefontaine* v. *Roberge*, 20 R. I. 418; *Cleasby* v. *Reynolds*, 26 R. I. 236.

Section 3 of Chapter 285 of the General Laws provides, among other things, that no "judgment or other proceeding

in civil cases in any court shall be  .  .  .   reversed for any defect or want of form, but the court shall proceed and give judgment according as the right of the cause and matter in law shall appear unto it, without regarding any imperfections, defects, or want of form in such  .  .  .   judgment or proceeding whatsoever."

Section 24 of Chapter 298 of the General Laws provides "exceptions to decisions or rulings prior to trial shall be open to revision after verdict or final decision on the merits, but so far only as it appears to the supreme court that the verdict or final decision was erroneously affected thereby."

We are of the opinion that the decisions and rulings prior to trial upon which said six exceptions are based did not erroneously affect the final decision in this case and they are therefore all overruled.

(2)  One of the principal defences to this action is based upon the fact of the removal by Fred S. Farwell, one of the original sureties on said bond, of his name therefrom. Two of his co-sureties, the Franklins, who say that Farwell's name was on the bond when they signed, had no knowledge of the erasure of Farwell's name. There is no evidence as to whether or not the other sureties on the bond knew of the removal of Farwell's name. It is well settled law that the sureties who did not know or consent to the removal of Farwell's name would not be bound on the bond. Such of them, if any, as knew or consented to such removal would be bound. Assuming that all the sureties were so discharged, the defendant in her second and third pleas alleges that no sum ever became due and payable under the bond, because it was null and void, and therefore there could be no liability under the guaranty. But this is error. For even if avoided as to all the sureties the bond was binding upon Mr. Johnson, and therefore was not null and void.' 2 Am. & Eng. Encyc. L. 195; *Howe* v. *Peabody*, 2 Gray, 556; *People* v. *Kneeland*, 31 Cal. 288.

(3)

In the present case the erasure of Farwell's name from the bond occurred before the guaranty was drawn, executed and

delivered.    Both the plaintiff and Mr. Banigan knew of the erasure long before the guaranty was drawn.    The plaintiff had no information as to whether any of the sureties on the bond or guaranty knew of the erasure except Mr. Banigan. There is no evidence showing whether or not Mr. Banigan had such information.    There is no evidence as to whether the other sureties on the guaranty knew of the erasure.    The

(4) defendant urges that Mr. Banigan did not know that Mr. Farwell's name had been removed without the knowledge of Farwell's co-sureties on the bond, and did not know that his co-sureties on the guaranty were unaware of the removal of Farwell's name from the bond, and on account of this lack of knowledge, Mr. Banigan and herself were relieved from liability on the guaranty.    This defence implies the proof of facts not established by the evidence as stated above.    But assuming the facts to be established as stated yet it does not by the weight of authority afford a good defence.

The case of *State* v. *Van Pelt*, 1 Ind. 304, was an action on a bond, given by one Dinwiddie as principal and by Evans, Polke and Burnside as sureties.    After delivery Evans' name was removed from the bond without the knowledge or consent of Polke and Burnside, but with the knowledge and consent of Dinwiddie and of the defendant, who then and there signed in place of Evans.    The defendant pleaded that when he executed the bond he did not know, believe or suspect that Evans' name was struck out and Evans was released without knowledge or consent of Polke and Burnside.    The court held this to be no defence, saying:    "The circumstance that the defendant, when he executed the bond, did not know, believe, or suspect, that the striking out of *Evans'* name, and *Evans'* release were without the knowledge or consent of *Polke* and *Burnside*, does not affect defendant's liability.    If he did not wish to be bound unless as a co-obligor with *Polke* and *Burnside*, he should have ascertained, before he executed the bond, whether or not they had agreed to the alterations, and upon finding that they had not he should have declined to execute it."

The defendant in that case also pleaded that he and plaintiffs intended and understood that he was to be bound only with Dinwiddie, Polke and Burnside and not with Dinwiddie alone. As to this the court says: "The parties to a transaction are presumed to know what will be its legal effect. In the case before us, the legal result of the erasure and insertion aforesaid, under the circumstances of the case, was to release *Polke* and *Burnside* from the bond, and to cause it to be the bond of defendant and *Dinwiddie* alone; and the defendant cannot be permitted to aver that those acts were not intended to produce that effect."

*Mitchell* v. *Burton*, 39 Tenn. 613, is an action of covenant on a bond. The bond had been signed by the principal and three sureties. The obligees erased the name of a surety without the knowledge or consent of the co-sureties. The principal obligor obtained the names of two other persons as sureties. These last two defendants pleaded that they signed the bond "after the other defendants, and upon the faith of their being bound, and without any knowledge or information that they were not bound or that the writing obligatory had been altered by the plaintiffs." The original co-sureties were discharged. As to the last two the court says, "The obliteration occurred before the bond was signed by them. It was palpable to their observation. They knew the fact for it was before them. They signed with that knowledge. The plaintiffs concealed nothing from them; all that they had done, and the fact complained of, was visible. It may be true that they did not know by whom it was done, nor that the circumstances were such as to discharge the joint obligors before then. . . . But that was their own fault; they were, or should have been put upon the inquiry of the obliteration of the names, or should have satisfied themselves before they signed, as to all the circumstances."

(5) It also is clear upon the authorities that an obligee is not under the duty to investigate in order to learn whether the removal of a surety's name has been consented to by the

other sureties or to warn a surety signing later on that point who has knowledge of such removal. The surety is under obligation to look out for himself.

In *Western N. Y. Life Ins. Co.* v. *Clinton*, 66 N. Y. 326, at page 331, the court says, "The position that the obligee on a bond is bound to seek out the sureties and explain to them the nature and extent of their obligation at the point of losing the security or that he is to be held responsible for the fraudulent representations or concealment of the principal of the facts is somewhat novel and is not upheld by any adjudged case. It is the duty of the sureties to look out for themselves and ascertain the nature of the obligation embraced in the undertaking, and any other rule would not only work serious inconvenience, but render securities of this character of but little, if of any, value." This was an action on the bond of an insurance agent, the bond reciting the appointment of the agent "for the purpose of procuring applications for life insurance and allowing premiums thereon." There were two contracts with the agent, the second relating to collections on the renewal of policies negotiated by a former agent. The sureties had no knowledge of the second agreement and denied liability as to it.

In *Jones* v. *Swift*, 94 Ind. 516, Brumfield, Diehlman and Steele were sureties on a replevin bond on which Monger was principal. Jones was induced to become surety in place of Steele on the assurance of Monger that the other sureties consented. The obligee released Steele on the same assurance. The other sureties had not in fact consented. Brumfield and Diehlman were released as sureties and Jones held. The court, on page 520 says, "In the case under consideration, the appellant, by the exercise of ordinary prudence might have guarded and protected himself against the fraud that was practiced upon him by requiring Monger to procure and produce the consent, in writing, of Brumfield and Diehlman on the release of Steele before becoming such replevin bail, or by requiring them to enter such consent on the record of the judgment, or by

making personal inquiry of them as to their having consented to the release. It was negligence on the part of the appellant to rely solely upon the representation of Monger, when the means of ascertaining with certainty the truth of Monger's assertion and preventing the commission of the fraud that was perpetrated, was within his power."

In *Sherman* v. *Harbin*, 125 Iowa, 174, which is an action on two bonds, the court says on page 180, "If the surety is absent so that no direct communication can be made, the obligee is under no obligation to search out the surety and warn him of the danger of the step he is about to take. In such case he has a right to assume that all the information desired has been obtained from the principal. . . . The same rule necessarily applies even though the surety be present, when all the facts are as accessible to the surety as the obligee." And on page 186 of the same case the court says, "Failure to communicate what a person does not know cannot amount to a fraud unless he is under obligation to investigate. The obligee owes the surety no such duty." See, also, *Lee* v. *Wisner*, 38 Mich. 82, 86, 87; *McCormick* v. *Hubbell*, 4 Mont. 87; *Russell* v. *Freer*, 56 N. Y. 67.

(6)    If Mr. Johnson practiced fraud upon any of the sureties, either on the bond or the guaranty, in order to obtain their signatures, that would not be a defence if the plaintiff was not privy to it. Mr. Johnson promised the Franklins that he would get twenty sureties and, if not satisfactory to them, would cancel their names on the bond. He delivered the bond without keeping his agreement, which was not known to plaintiff. This would not be a defence, even as to the Franklins, although the point is not important as to them, as they were relieved by the removal of Farwell's name. In such case the sureties are held to be estopped to set up the defence. As to this point see *State ex. rel. McCarty* v. *Pepper*, 31 Ind. 76; *State ex. rel. Lakey* v. *Garton*, 32 Ind. 1; *York Co. M. F. Ins. Co.* v. *Brooks*, 51 Me. 506.

(7)    The second principal defence is that the lessor by entering into a contract for the making of the improvements and

alterations referred to in the lease requiring their completion during the fall of 1901, changed the obligation of the lessee to pay the first instalments of the "Improvement Fund" and the "Furniture Fund" on May 31, 1901, as guaranteed and thus released the defendant's testator and herself as executrix. The lease does not fix any time for the completion of said improvements and alterations. It may fairly be inferred from the lease itself that those named as parties to it at the outset supposed that it would go into effect approximately at the time of its date; there is also a suggestion of the expectancy that the alterations might be made at or not much later than November 1, 1900, by the provision for the rebate of all sums becoming due as rent under (a) of the "first" paragraph of the lease accruing from said November 1, 1900, to such time as the premises should be ready for occupancy. By fixing the date of May 31, 1901, for the payment of said first instalment of said two funds it must have been expected that before the last mentioned date the work of improvement and furnishing would be completed and that the lessee would be in possession of the demised premises. That would be a year, lacking one day, after the date of the lease. All of these expectations undoubtedly were based upon the facts of the execution of the lease and the commencing of the work of alterations on or about June 1, 1900.

But the lease did not go into effect until some time in January, 1901, more than seven months after its date, owing chiefly to the inability of the lessee to give the security required by the lessor for the payment of the rent. For although the lease bears date June 1, 1900, was executed by the lessee on or about July 11, 1900, and by the lessor on November 27th, 1900, it, together with said bond and said guaranty, was not delivered until January 5, 1901, or a little later. And delivery gave it effect. In *Hall* v. *Cazenove*, 4 East, 477, at page 481, Lord Ellenborough says, "First, as to the objection that the party is estopped from saying that the deed was *indented, made, and concluded* on a

different day from that on which it bears date, I see nothing inconsistent with the deed in such an allegation, any more than if he had alleged that it was sealed and delivered on a day subsequent. It is quite unimportant when it was *indented*, and equally so when it was *made*, by which may be understood when it was *written*. Then the only material word is *concluded*, and a deed can only be said to be *concluded* when it is *delivered*. The time of delivery is the important time when it takes its effect as a deed." Of course the lapse of more than seven months before the delivery of these instruments and the commencement of the alterations must, of necessity, have changed the reasonable expectations of the parties to this transaction as to the time for the completion of said alterations, of occupancy of the demised premises and of the first payment of rent. The lease, therefore, is to be examined and construed in the light of all the circumstances shown to exist at that time and according to the construction then put upon it by the parties to it and Mr. Banigan, so far as is permissible under the rule of construction, applicable to the point here considered. Such a rule of construction is well established.

In *Wesley* v. *Cartier & Sons*, 30 R. I. 403, the court says on page 408: "It is a well-settled rule that in construing a written instrument the court will consider all the facts and circumstances existing at the time of its execution; such as the relation of the parties, the nature and situation of the subject-matter, *and the apparent purpose of making the instrument.*" . . . "This court in construing deeds, wills and other instruments . . . has always considered all the facts and circumstances, the relation of the parties . . . and has always given great weight to the construction placed by the parties themselves, by their acts and conduct, upon the particular instrument under which claim is made."

In *Hooper* v. *Hooper*, 81 Md. 155, at page 169, the court says: "A guaranty is a mercantile instrument, to be construed according to what is fairly to be presumed to have

been the understanding of the parties, without any strict technical meaning, but in furtherance of its spirit, and liberally to promote the use and convenience of commercial intercourse. It should be given that effect which will best accord with the intention of the parties as manifested by the terms of the guaranty, taken in connection with the subject-matter to which it relates, and neither enlarging the words beyond their natural import in favor of the creditor nor restricting them in aid of the surety. The circumstances accompanying the whole transaction may be looked to in ascertaining the understanding of the parties."

In Brandt on Suretyship and Guaranty, Section 103, it is stated: "Thus a contract of suretyship and an instrument therein referred to or executed as part of the same general transaction are read together and considered with all the surrounding circumstances." See, also, *Gaddes* v. *Pawt. Inst. for Savings,* 33 R. I. 177, 186; *Lee* v. *Butler,* 167 Mass. 426; *Davis* v. *Wells, Fargo & Co.,* 104 U. S. 159; *Michigan State Bank* v. *Peck,* 28 Vt. 200; *St. Paul Title & Trust Co.* v. *Sabin,* 112 Wis. 105.

The defendant does not claim that in express terms the parties to the lease extended the time for payment of the first instalments of the "Improvement Fund" and the "Furniture Fund," but because of the time fixed for the completion of the Mack & Moore contract these instalments could not be and were not, in fact, ascertained on May 31, 1901. Hence, an alteration in the time of payments of these instalments was effected. She does not concede that it was apparent in January, 1901, that the lessor could not before May 31, 1901, spend $50,000 in alterations and improvements and could not before that date purchase the furniture to be furnished by it or that in fact it was impossible to do these things. If in fact impossible of performance, then following *Hall* v. *Cazenove, supra,* the date aforesaid of May 31, 1901, might be disregarded as nugatory. It does not seem entirely clear that it was impossible to do these things by that date, although improbable. But that date for pay-

ment would as to the furniture impose needless expense upon the lessee by way of interest charges, and would be an unreasonable provision.

(8) It is well settled that a material alteration in the original contract by the parties thereto without the consent of the surety or guarantor releases such surety or guarantor. Even if a change were made in the principal contract without the guarantor's consent, when successive payments are called for the rule applicable in such case is stated in 2 White & Tudor, L. E. 8th ed. 590, to be as follows: "Where a contract is divisible, as for instance, where successive payments are to be made, at fixed periods, if the creditor gives time as to one of such payments he will relieve the surety (9) with regard to that payment only, but not with regard to the subsequent payments." *Croydon Gas Co.* v. *Dickinson,* 2 C. P. D. 46, being cited.

But in this case plaintiff claims that if the lease be construed as requiring the improvements and alterations to the extent of $50,000 at least to be expended and the furniture supplied by May 31, 1901, in order that the amount of said instalments might be definitely ascertained and payment thereof made, this requirement was dispensed with by the parties thereto with the consent of Mr. Banigan.

It is well recognized that a modification of the principal (10) contract, even after a guaranty has been given and accepted, does not release the guarantor if made with his consent.

*Adams* v. *Way,* 32 Conn. 160, was an action of covenant on a guaranty that a certain mortgage should be sufficient security for the loan to be secured by it. At page 172 the court says: "We assent fully to the doctrine, that if a man guarantees the debt of a third person payable at a particular time, a change in the time of payment, whether for a longer or shorter period, made by the debtor and creditor, without the consent of the guarantor, would discharge the guaranty. But it could not be tolerated for a moment that if the change was made with the full knowledge and consent of the guarantor, he could take advantage of it to avoid his contract.

The evidence offered by the plaintiff tended to show that the defendant assented to the mortgage that was in fact given, as the one which was to be given, and not only so, but that he induced the plaintiff to pursue measures and incur expenses, on the ground that it was such a mortgage, which he might not otherwise have done.    Surely the doctrines of waiver and estoppel are broad enough to cover such state of facts as this."    See, also, *Wyke* v. *Rogers,* 1 DeGex, M. & G. 408; *Woodcock* v. *Oxford Ry. Co.,* 1 Drewry, 521; *Rockville Bank* v. *Holt,* 58 Conn. 526; Brandt on Suretyship, *supra,* Sec. 379.    The evidence, as already stated, shows that Mr. Banigan was the chief, if not only, financial backer of Mr. Johnson, that he was interested in Mr. Johnson personally as a friend, took him on a yachting trip and believed in his hotel project.    He saw the lease and bond, and while they and the guaranty were in the hands of Mr. Comstock, was consulted about the contract for making the alterations, saw the plans and specifications, suggested bidders for the contract, knew that Mack & Moore had obtained the contract, and what is more significant permitted the delivery of his guaranty simultaneously with the delivery of the lease, bond and the Mack & Moore contract as part of one transaction. From their close relations it is fair to infer that Mr. Banigan knew that Johnson had not already received his lease and that the papers were to be delivered together.    It is also reasonable to conclude that Mr. Banigan advised the acceptance of the Mack & Moore contract for alterations as the lowest offered.    The fact that consent is given may be shown by circumstantial evidence.    Tacit acquiescence is enough.    27 Am. & Eng. Encyc. of Law 529.    A change in a contract of which the guarantor has notice when he delivers the guaranty is clearly no defence.    *Powell* v. *Fowler,* 85 Ark. 451.

The plaintiff also claims that under the testimony as applicable to its equitable replication the defendant is estopped from claiming that there was any alteration of the risk assumed by her testator in his guaranty.    The testimony

does clearly show that without the guaranty there would have been no lease to Johnson. Negotiations were at a standstill and the plaintiff refused to execute the lease until Mr. Banigan agreed to guarantee the bond to the extent of $25,000. It is plain that the plaintiff relied on Mr. Banigan as guarantor and not on the co-guarantors of whom he knew nothing. All of this was known to Mr. Banigan. Upon the giving of the guaranty the plaintiff went ahead and executed the lease, and expended more than $130,000 in carrying out the terms of the lease. Mr. Banigan at least knew of the Mack & Moore contract for $90,000. For Mr. Banigan to know that plaintiff was proceeding to this expenditure and the execution of said lease in reliance upon his guaranty it would be unconscionable for him to maintain silence and afterwards to try to avoid liability on his guaranty. He would be equitably estopped from making such defence. *Adams* v. *Way, supra,* 29 Am. & Eng. Encyc. of Law, 1102.

As another objection to this line of defence the plaintiff also claims that the payment of said first instalment on May 31, 1901, was waived by it. The Presiding Justice based his final rescript and decision on this point holding "that the action of the lessor in entering into a contract which would necessarily extend the completion of the improvements beyond said date of May 31, 1901, simply amounted to a waiver by the lessor of one of the terms of the lease." The claim of waiver by plaintiff is entirely tenable in the case as between lessor and lessee and under the terms of the bond guaranteed, providing that waiver by the lessor of any breach of covenant in the lease should in no way impair the bond, it would defeat the defence set up based upon the deferring of the time of payment of the first instalments. No waiver in express terms is shown. But waiver may be shown by conduct. And when "a person does some positive act which, according to its natural import, is so inconsistent with the enforcement of a right in his favor as to induce a reasonable belief that such right has been dispensed with, he will be deemed to have waived it." "Where time of

performance is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to this part of the agreement will be taken to have waived it." 29 Am. & Eng. Encyc. of Law, 1103, 1104. Both parties to the lease acted on May 31, 1901, as they would have done if payment on that day had been expressly waived. We are of the opinion, therefore, that the postponement of the time of the payment of the first instalments of the "Improvement Fund" and "Furniture Fund" under the circumstances shown by the testimony did not operate to release Mr. Banigan from his liability as surety on the guaranty.

Another defence urged most strenuously is that the interpretation of the lease by the Superior Court in its rescript of November 15, 1906, in sustaining the defendant's demurrer to the plaintiff's fifth replication became the law of the case thereafter for the Superior Court and also for this court, inasmuch as such decision has not been brought before this court for review by exception.

We cannot assent to this doctrine. The decision sustaining the demurrer did not dispose of the case, as there were issues of fact raised by the pleadings remaining to be tried. On the same day the Superior Court overruled defendant's demurrer to the fourth replication, and at that time there had been joinder on several issues. The decision sustaining the demurrer to the fifth replication has due effect in the elimination from the record of such replication, unless such decision is reversed on exception thereto. But we know of no rule or law which will prevent a justice of the Superior Court at the trial or final hearing of a case on the issues as they then stand in the case from deciding any question of law which may properly arise in the progress of said trial or final hearing in accordance with his best judgment and mature reflection, unhampered by any previous ruling or decision by him in the preliminary or previous travel of the case. He is not compelled to make what he believes to be an erroneous ruling or decision because he has made such error

in an earlier stage of the case.   This court is bound by the
decision of the Superior Court in sustaining the demurrer to
the fifth replication, to the extent that said replication and
the issue attempted to be raised by it are not now in the case,
as said court's action in that respect is not before the court
for review, but this court is not bound by the statement by
the lower court of its grounds for reaching said decision.   In
our judgment there is no merit in this line of defence.

One or two other matters of defence were suggested, but
we do not deem them of sufficient importance to entitle
them to prolonged or serious discussion.

Of the remaining one hundred and sixteen exceptions, all
except the last two exceptions are exceptions taken to the
introduction of testimony.   At the hearing fifty-four of the
one hundred and fourteen only are pressed.   We have
examined them all and without discussing them in detail
are of the opinion that they are in most instances not well
taken and that in the other cases the testimony objected to
was unimportant and immaterial.   These exceptions are all
overruled.

The 121st exception is taken to the final decision of the
court for the plaintiff on June 10th, 1912, for $11,726.81.
Nine grounds or points are stated under said exceptions on
the defendant's brief, the first eight of which have been
directly or indirectly but sufficiently hereinbefore considered.
The ninth ground or point is:   "If there is a liability against
this defendant under the guaranty the damages awarded
are excessive."   The evidence in the case shows that in the
postponement of the time for the payment of the instal-
ments of the "Improvement Fund" and the "Furniture
Fund" due May 31, 1901, no other time or date for pay-
ment thereof was or ever has been agreed upon.   The pay-
ment of said instalments was not released, it was simply
deferred.   This was the understanding of the parties to the
lease, as shown by their conduct when collection thereof was
attempted after the occupation of the hotel property by
Mr. Johnson.   The plaintiff only claims that they would

become payable within a reasonable time after the date named, and concedes that it is a question for the court to determine what was a reasonable date for the payment of said two first instalments. In determining this question of reasonable date it is proper to gather as far as we can what time after occupancy of the hotel was originally intended to be allowed the lessee to make such payments and to consider any changes in the condition or circumstances of the parties, or either of them, well-known to both, which rightfully and equitably can affect the question. The lease itself by the provision for rebate of rent after November 1, 1900, seems to indicate the general expectancy of occupancy by that time, but its uncertainty was indicated by this very provision for rebate. At most seven months delay in payment after occupancy was in contemplation with a possibility of less. This in a general way was apparently a reasonable time in the contemplation of the parties at the beginning. In addition, however, between the time of the delivery of the lease, bond and guaranty and October 12, 1901, when Mr. Johnson entered into possession under the lease there had apparently been a marked change in the latter's financial condition in respect of his control of funds to start his hotel venture, of which Mr. Shepard, as manager and agent of the plaintiff in the whole transaction had knowledge. Evidently Mr. Johnson was a man of small financial means. Mr. Shepard shows his knowledge of that fact by his insistence on security for the rent. By the lease the plaintiff was under obligation to furnish certain furniture, but not "bedding of any description, linen, silverware, glass-ware, china, kitchen utensils, bric-a-brac or ornaments," to say nothing of the stocking of the hotel with supplies, all of which were essential, and all of which Mr. Johnson was in some way to furnish. Mr. Johnson had told Mr. Shepard before the giving of the guaranty that "Mr. Banigan was to let him have the money to start with and back him in the running of the hotel" (see defendant's transcript of evidence, testimony of Mr. Shepard, answer to Q. 231). It is apparent from Mr. Shepard's

answer to questions 106 and 107 of his testimony in said transcript, that Johnson did not get this money from Mr. Banigan or his estate or from any other source, and that in consequence he was short of funds for the making of his payments.  Mr. Shepard knew this before ousting Mr. Johnson.  Mr. Banigan died in February, 1901, about a month after the signing of the Mack & Moore contract. Mr. Shepard must have known of the change in Mr. Johnson's financial prospects owing to Mr. Banigan's death. Nevertheless he went on with the completion of the improvements, and put Mr. Johnson in possession on October 12, 1901.  Of course, Mr. Johnson had in some way furnished the hotel as needed by him.  This is shown by the testimony as to the property in the hotel belonging to him at the time of the assignment.  With knowledge of Mr. Johnson's financial condition in a general way, at least, and of necessity knowing that his only source of income would be the hotel, the plaintiff stood by while Johnson incurred this expense of furnishing and starting the hotel, and on October 31, 1901, nineteen days after the lessee took possession presented him with an account of the amount due it from him on that day of $8,983.31,—$6,092.30 of which was for the first instalments of said two funds.  It must have been obvious if this claim could then be pressed and was pressed that the lessee would be forced out of the hotel, and perhaps into insolvency. Such a proceeding would have been unconscionable and quite in disregard of the principles of equity as the basis of estoppel which the plaintiff itself has invoked in this case.  As already stated, claims were thereafter presented on November 30, 1901, December 31, 1901, and January 31, 1902, each containing the amounts of said instalments.  These claims were not pressed beyond vigorous attempts to collect on account, resulting in the payment of $3,000 by Mr. Johnson, in sums of $1,000 each, until February 13, 1902, when he was dispossessed, four months and one day after the lessee entered into occupation, and thereupon the plaintiff took possession.  In the meantime, on January 15, 1901, the

lessee made an assignment for the benefit of his creditors, being forced to do so by the pressure of their claims. It is plain that Mr. Johnson did not expect to be pressed for the payment of these instalments in the manner demanded. It appears on page 161 of said transcript, Q. 325, that he claimed that he had not been given time enough to pay this bill, and also that he demanded large damages for being ousted. Under these conditions we do not think it can be rightfully claimed that he recognized said instalments to be due when he made the three payments on account. In any event the rent under "a" and the interest on the two funds exceeded the payments made, and he undoubtedly was in arrears when put out. In the light of this condition and these surroundings we are of the opinion that on February 13, 1902, when dispossessed, the lessee had not had a reasonable time for the payment of the said first instalment of the two funds and that said two instalments were not then due.

The plaintiff does not assert any right to collect any more than the instalments of rent due and payable at the time the premises were repossessed by him. Such instalments would be the rent due under "a" of paragraph "First" and the interest on the "Improvement Fund" and the "Furniture Fund." Deducting said two instalments of said two funds we compute the amount to be recovered by the plaintiff as $5,636.67 with interest from the date of its writ, the plaintiff having by its one exception in its bill of exceptions before referred to, beyond peradventure, presumed its right to recover interest.

The 122nd exception of the defendant taken to the decision of the Presiding Justice filed June 11, 1912, allowing interest on the amount found to be due as stated in his rescript of June 10, 1912, is disposed of actually if not technically by the allowance of interest as already stated.

As there is no disputed question of fact to be considered in ascertaining the amount due the plaintiff in accordance with the terms of this opinion, but only computation thereof is necessary, the cause is remitted to the Superior Court with

directions to enter judgment for the plaintiff for $5,636.67 with interest thereon from the date of plaintiff's writ.

*Comstock & Canning, Gardner, Pirce & Thornley,* for plaintiff.

*John W. Hogan, Philip S. Knauer,* for defendant.