DECISION
Before this Court for decision is a contract dispute between Kevin M. Sheehan ("Sheehan" or "Plaintiff") and the Town of North Smithfield ("Town" or "Defendant"). Plaintiff Sheehan's nine-count civil action is based on a disagreement with the salary and benefit conditions of his former principalship at the North Smithfield Junior-Senior High School. Plaintiff brings claims for Breach of Contract (Counts I and III), Fraud (Count V), Negligent Misrepresentation (Count VI), Conspiracy (Count VII), and Aiding and Abetting (Count VIII).[1]
As a remedy, Plaintiff requests compensatory damages, Promissory Estoppel (Count IV), and Punitive Damages (Count IX). This Court has jurisdiction pursuant to G.L. 1956 §§ 8-2-13 and 8-2-14[2] and renders its decision in accordance with Rhode Island Superior Court Rule of Civil Procedure 52. *Page 2 
 I Facts and Travel
Plaintiff began his teaching career in Warwick, Rhode Island in 1974. In 1989, he took his first administrative position as assistant principal of Narragansett Junior-Senior High School. After briefly serving in that capacity, Plaintiff returned to Warwick to serve as an assistant principal at Pilgrim High School. Thereafter, in September 1994, Plaintiff responded to an advertisement appearing in The Providence Journal, seeking applicants for the position of principal at North Smithfield Junior-Senior High School. (Ex. 2.) North Smithfield's advertisement stated that the salary range for the principalship was $60,000 to $68,000 for a 225 day work-year. Id.
 A Plaintiff's Application Process for the North SmithfieldPrincipalship
As part of the application process, several individuals and committees within the North Smithfield School District interviewed Plaintiff. He first met with a search committee, which consisted of school administrators, teachers, students, and parents, and then appeared before the entire North Smithfield School Committee ("School Committee") and Superintendent John Moretti ("Moretti"). Moretti also interviewed Plaintiff privately. For his final meetings, Plaintiff conferenced with the North Smithfield Junior-Senior High School faculty and student leaders, and then met with Moretti again. School Committee member Jonathan Mundy ("Mundy") testified in his deposition that "[t]ypically what would happen at that point[, after a successful series of interviews, is] . . . [the School Committee] would charge the superintendent with contacting the candidate and indicating to the candidate that they were a choice." (Ex. 21 at 24.) Mundy stated that the superintendent does not negotiate a new principal's contract, but "would *Page 3 
work with the candidate to see if they would be willing to accept the position based on the perimeters [sic] we[, the School Committee,] set forth." Id. at 25.
True to this procedure, Moretti telephoned Plaintiff in early October 1994 after their final meeting to offer him the North Smithfield principal position. According to Plaintiff's recollection, however, Moretti did not just discuss the parameters of salary and benefits; instead Moretti indicated that he was authorized to offer Plaintiff an annual salary of $65,000, twenty-five vacation days, and an advanced degree stipend of $1944 per year. Plaintiff further testified that Moretti said he would receive the same healthcare benefits as North Smithfield's teachers. At the time of Plaintiff's hiring in 1994, the teachers' healthcare contract did not require teachers to co-pay for their insurance, (Ex. 24), and Moretti did not discuss co-pay contribution with Plaintiff during their telephone conversation. Plaintiff accepted the position on their discussed terms, and Moretti invited Plaintiff to the October 18, 1994 School Committee meeting for his official appointment. After Moretti's alleged telephone offer, Plaintiff testified that he immediately called the superintendent of Warwick's School Department to initiate his transition from Pilgrim High School to North Smithfield Junior-Senior High School.
Ultimately, the School Committee did not approve the terms that Moretti allegedly had offered Plaintiff. School Committee member Robert Lafleur ("Lafleur") testified in his deposition that standard hiring procedures allow a superintendent to recommend an appropriate salary for the new principal to the School Committee, but the final appointment decision is reserved for the School Committee. (Ex. 23 at 24.) Lafleur stated, "at no time in my tenure, whether I was a member or chairman, did we ever give the authorization to the superintendent to negotiate a verbal contract as to what the terms and conditions of any new employment or employee would be." Id. He explained that during the closed session of the October 18, 1994 *Page 4 
School Committee meeting, Moretti recommended a $65,000 salary for Plaintiff, but the School Committee settled on $62,000. (Ex. 23 at 34.) Lafleur, who served on the North Smithfield School Committee from 1977-1999, and then again from 2004 through the date of his deposition on May 29, 2007, also testified that during his tenure, the School Committee had not previously rejected a superintendent's salary or fringe benefit recommendation. (Ex. 23 at 11, 29.)
While the School Committee was deliberating in a closed session during the October 18, 1994 meeting, Plaintiff spoke with Moretti outside the conference room. Moretti allegedly informed Plaintiff that his salary would not be $65,000 per year as the pair had discussed initially, and Plaintiff would receive twenty-two vacation days rather than twenty-five days. Moretti also told Plaintiff that he would not collect an advanced degree stipend for the first year and would have a 20% co-pay for his health insurance. Plaintiff claimed that Moretti acknowledged the more lucrative prior offer, but assured Plaintiff that the difference would be made up to him by July 1, 1995. Though Plaintiff testified that he was "perplexed" and "bewildered" by Moretti's "unethical" rescission, Plaintiff nonetheless chose to accept the School Committee's allegedly different terms. Plaintiff claimed that he had already resigned from Pilgrim High School and had to accept the North Smithfield position or face certain unemployment. Lafleur recalled, "I believe Mr. Moretti came back in [the closed session] and said everything is all set, Mr. Sheehan is going to accept the position." (Ex. 23 at 35.) The School Committee voted unanimously to approve Plaintiff's appointment as principal of North Smithfield Junior-Senior High School at an annual salary of $62,000 for 225 workdays and a 20% co-payment for medical coverage. (Ex. 4.) The minutes of the October 18, 1994 meeting note: "Following his appointment, Mr. Sheehan thanked the Committee, and stated he was honored to have the opportunity to lead the high school into the twenty-first century." Id. *Page 5 
The following day, October 19, 1994, Moretti sent a letter to Plaintiff outlining the principalship's $62,000 annual salary and its benefits. (Ex. 5.) On this same day, despite his verbal acceptance of the School Committee's offer, Plaintiff claimed that he was so disappointed with the actual terms of his North Smithfield employment that called the Warwick superintendent to inquire whether he could retain his assistant principal position at Pilgrim High School. Allegedly, Warwick's superintendent was unable to accommodate Plaintiff's request because in the two weeks between Plaintiff's call to initiate his transition plan and the North Smithfield School Committee meeting, Warwick had advertised, interviewed and hired his replacement. As such, on October 20, 1994, Plaintiff submitted his letter of resignation to the Warwick School Department, officially resigning from his position as Assistant Principal at Pilgrim High School. (Ex. 6.) Plaintiff began his tenure as North Smithfield's Junior-Senior High School principal on November 7, 1994.
 B Plaintiff's Grievances with the Principalship's Vacationand Salary Benefits 1 Vacation Benefits Grievances
During his first year as principal, Plaintiff attempted to take vacation days, but reportedly was told by Moretti that administrators were not allowed to use vacation time during their first year. Moretti explained that an administrator's first-year vacation days were put into an accrual and compensated at the per diem rate when the administrator left the school district. Mundy and Lafleur, however, both testified that they were unaware of a School Committee policy prohibiting first-year administrators from taking vacation. (Ex. 23 at 45; Ex. 21 at 31.) Lafleur did recall an unwritten practice where administrators were paid for unused vacation days at the end of their tenure with the school district. (Ex. 23 at 47.) Mundy likewise agreed that although there was no policy regarding payment of unused vacation days at the end of each school year, *Page 6 
he did acknowledge that there was a practice to "pay people leaving the school system the full amount of accumulated, unused vacation time." (Ex. 21 at 31.)
In December of 1997, the North Smithfield School Committee promulgated a written vacation policy ("1997 Policy") for administrators after a proposal by a committee of administrators, including Plaintiff. (Ex. 21 at 44.) This 1997 Policy terminated the unwritten practice that allowed administrators to carry over five vacation days from the current year to the next fiscal year. (Ex. 14 ("No administrator/director will be allowed to carry-overany vacation days in the 1998-1999 fiscal year and into subsequent years.")) (emphasis added). Another provision of the 1997 Policy, which took effect in the 1997-1998 school year, entitled Plaintiff (and other administrators) to twenty-five vacation days per year, an increase from the twenty-two days Plaintiff was initially afforded by the School Committee.Id. However, Plaintiff was not identified as "grandfathered" under policy item (2), [3] a distinction that permitted certain administrators to carry more than twenty-five vacation days per year if he/she had accrued the extra days before the implementation of the 1997 Policy. As Plaintiff had not accumulated more than twenty-five days, he was ineligible for "grandfathered" status.Id. The 1997 Policy also provided that if an administrator terminated his or her employment after July 1st of a given year, the administrator would be paid a per diem of the accrued vacation days based on his/her prorated monthly salary.[4] Id. *Page 7 
At a School Committee meeting prior to the 1997 Policy's enactment, Plaintiff asked how the new policy would apply to the vacation time he had already accumulated. Lafleur allegedly told Plaintiff that he would be "grandfathered" and would receive payment for the vacation days that he had accrued. Though Lafleur did not recall speaking to Plaintiff about the "grandfather issue," Lafleur testified that he interpreted the policy to mean that any person hired before its adoption would not lose accumulated vacation time. (Ex. 23 at 54.)
 2 Salary Grievances
Plaintiff did not receive additional compensation by July 1, 1995 as allegedly promised. He recalled questioning Moretti about the assurances Moretti made outside the October 18, 1994 School Committee meeting. Moretti supposedly acknowledged his promise, but informed Plaintiff that the Town did not have the funds to compensate him. Plaintiff also testified that he verbally complained about his salary to School Committee members Mundy, Lafleur, Meo, and Cleary. Lafleur and Mundy remembered fielding Plaintiff's complaints and questions. A few months after his appointment, Plaintiff informed Lafleur that Moretti had offered him the principal position at a higher salary than was approved by the School Committee. (Ex. 23 at 38.) Lafleur testified that Plaintiff told him that "[he] was promised a specific salary, and that it didn't happen. And the only reason . . . [he] took the position was because he had given his other employer notice." Id. Similarly, Mundy testified that approximately two years after his appointment, Plaintiff confronted him with the claim that "the salary he was promised and the salary he received weren't the same." (Ex. 21 at 27-28.) The salary discrepancy was not addressed further by Lafleur, Moretti, Mundy or Plaintiff while Plaintiff was employed by the Town. *Page 8 
 C Plaintiff's Resignation from the North SmithfieldSchool District
Plaintiff resigned from his principal position in August 2000 after completing six terms at North Smithfield Junior-Senior High School. During these six years, Plaintiff did not apply for higher paying positions in other school districts, nor did he file a written complaint to the Town regarding the salary discrepancy. Plaintiff testified that he remained at North Smithfield for six years despite his dissatisfaction with the salary because he "was not a quitter" and because he hoped that the School Committee ultimately would appreciate his work at the Junior-Senior High School.
Before his resignation in August 2000, Plaintiff sought payment for his unused vacation days from the School Committee at a meeting held on June 20, 2000. He also wrote a letter to the superintendent at that time, Richard Scherza, requesting compensation for his thirty-one (31) unused vacation days — the twenty-two days he did not use during his first year in 1994, the five additional days that Moretti, with the approval of the School Committee, allowed administrators to accrue in 1996, and the four vacation days he would accrue in July and August of 2000 pursuant to the 1997 Policy. (Ex. 18.) Plaintiff also sought recompense from the School Committee because his initial salary was less than the amount promised by Moretti. At its June 20, 2000 meeting, the School Committee voted unanimously to deny all of his requests.[5] (Ex. 17 at ¶ 22). *Page 9 
On April 1, 2002, Plaintiff filed a Complaint[6] in this Court claiming the Town committed breach of contract, fraud, negligent misrepresentation, conspiracy, and aiding and abetting.[7]
Following a denial of the Town's Motion for Judgment on the Pleadings and a later denial of a Motion for Summary Judgment as to the counts listed above, this matter was reached for a jury-waived trial on January 7, 2009. During the trial, this Court heard testimony from the Plaintiff and deposition testimony from Superintendent Moretti and School Committee members Lafleur and Mundy. Plaintiff admitted a series of exhibits into evidence as well. The Town did not present any additional live witnesses or enter its own exhibits.
 II Standard of Review
Rule 52(a) of the Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon" Super. R. Civ. P. 52(a). In a non-jury trial, "the trial justice sits as a trier of fact as well as law."Parella v. Montalbano, 899 A.2d 1226, 1239 (R.I. 2006) (quoting Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984)). "`Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences.'" Id. (quoting Hood, 478 A.2d at 184). It is well established that "assigning credibility to witnesses presented at trial is the function of the trial justice, who has the advantage of seeing and hearing the witnesses testify in court."McBurney v. Roszkowski, 875 A.2d 428, 436 (R.I. 2005) *Page 10 
(citations omitted). The trial justice may also "`draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as other factual determinations.'" DeSimone Electric, Inc. v. CMG, Inc.,901 A.2d 613, 621 (R.I. 2006) (quoting Walton v. Baird,433 A.2d 963, 964 (R.I. 1981)).
Furthermore, "[w]hen rendering a decision in a non-jury trial, a trial justice `need not engage in extensive analysis and discussion of all the evidence. Even brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case.'" Parella,899 A.2d at 139 (quoting Donnelly v. Cowsill,716 A.2d 742, 747 (R.I. 1998) (citation omitted)). The trial justice need not "categorically accept or reject each piece of evidence in his decision for [the Supreme] Court to uphold it because implicit in the trial justices [sic] decision are sufficient findings of fact to support his rulings." Notarantonio v.Notarantonio, 941 A.2d 138, 147 (R.I. 2008) (quotingNarragansett Elec. Co. v. Carbone,898 A.2d 87, 102 (R.I. 2006)). In non-jury cases, our Supreme Court is "deferential to the trial justice's findings of fact and give[s] them great weight." Cathay Cathay, Inc. v. Vindalu, LLC,962 A.2d 740, 745 (R.I. 2009). Accordingly, if the trial justice's decision "reasonably indicates that [he or she] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." Now Courier, LLC v. Better Carrier Corp.,965 A.2d 429, 434 (R.I. 2009) (quoting Notarantonio,941 A.2d at 144-45 (citation omitted)).
 III Analysis A Breach of Contract (Counts I and III)
"It is well established that a valid contract requires `competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.'" DeAngelis v. *Page 11 DeAngelis, 923 A.2d 1274, 1279 (R.I. 2007) (quoting R.I.Five v. Med. Assocs. of Bristol County, Inc.,668 A.2d 1250, 1253 (R.I. 1996) (internal citation omitted)). These contract postulates are no less valid when public entities and private parties make agreements, provided the person representing the public entity also has the authority to bind the municipality. In Casa DiMario v. Richardson, 763 A.2d 607 (R.I. 2000), the Rhode Island Supreme Court was presented with a consent agreement negotiated between a town solicitor and a local business. The Court's task was to determine whether the contract between these two parties was binding on the town. Because the town council had never authorized the solicitor to settle the lawsuit, the Court determined that the solicitor lacked "actual authority"[8] and his actions could not obligate the town to honor the consent agreement.Id. at 610 (finding also that the town solicitor lacked apparent authority). Our Supreme Court noted that it has "repeatedly held that `the authority of a public agent to bind a municipality must be actual.'" Id. (quoting Warwick Teachers' UnionLocal No. 915 v. Warwick Sch. Comm.,624 A.2d 849, 850-51 (R.I. 1993)). Thus, "any representations made by such an agent lacking actual authority are not binding on the municipality." Id. (quoting Sch. Comm. ofProvidence v. Bd. of Regents for Educ.,429 A.2d 1297, 1302 (R.I. 1981)); see also Waterman v.Caprio, 983 A.2d 841, 847 (R.I. 2009) (holding that erroneous statements made by the director of Rhode Island Employees Retirement System to the plaintiff regarding his disability retirement benefits did not bind the state to honor the director's representations because the director "lacked either actual or implied authority to waive, modify, or ignore applicable state law" and therefore had spoken ultra vires); Martel Inv. *Page 12 Group, LLC v. Town of Richmond, 982 A.2d 595, 600 (R.I. 2009) (finding that a town was not bound to honor a building permit because the town's building official lacked the actual authority to ignore a zoning ordinance provision when he originally granted the permit).
In Rhode Island, school committees have the power to enter into contracts, G.L. 1956 § 16-2-9(a)(18), but must act collectively at "public meetings since individual board members have no authority to bind the board." Sec. 16-2-9.1(a)(10). School committees also may delegate their responsibilities to their school district's superintendent.See § 16-2-9(a)(23) (affording school committees the ability to "delegate, consistent with law, any responsibilities to the superintendent as the committee may deem appropriate"). Accordingly, school committees are allowed, but are not required, to grant superintendents the actual authority to contract. In addition, without the express actual authority from a school committee, the default hiring duties of superintendents are expressly limited by school committee consent.See § 16-2-11(a)(7)-(8) (enumerating a superintendent's duties to "appoint all school department personnel with theconsent of the school committee" and to "administer the personnel function of the school department consistent with personnel standards, policies, and the table of organizationestablished by the school committee") (emphasis added);see also § 16-2-9(13) (stating that the school committee's duties include "giv[ing] advice andconsent on the appointment by the superintendent of all school department personnel") (emphasis added).
 1 The Superintendent and Individual School CommitteeMembers' Actual Authority
While school committees are permitted to delegate contract authority to their superintendents, the record in the instant case is devoid of any official actions on behalf of the School Committee delegating the actual authority to contract to Moretti. See Casa DiMario, 763 A.2d at 611 (holding that "[w]ithout a properly convened meeting at which council members *Page 13 
vote on the record in their official capacity, the council cannot be deemed to have exercised or delegated to the solicitor its powers to compromise [the business's] lawsuit against the town"). In fact, Lafleur testified that at no time during his tenure did the School Committee ever authorize a superintendent to negotiate a verbal contract with a new employee. (Ex. 23 at 24.) Mundy also testified that the superintendent would not negotiate a contract with a new employee but would "work with the candidate to see if they would be willing to accept the position based on the perimeters [sic] . . . [the School Committee] set forth." (Ex. 21 at 25.) Moretti repeatedly testified that he only made recommendations to the School Committee and did not actually hire school personnel. (Ex. 22 at 10-12, 14-16.)[9] Because it is clear that Moretti lacked actual authority to form a contract with Plaintiff, this Court finds that the Town was not contractually bound to pay Plaintiff a starting annual salary of $65,000, offer him health benefits without a co-pay, grant him twenty-five vacation days, or provide him an advanced degree stipend in his first year, as allegedly promised by Moretti. See Casa DiMario,763 A.2d at 610; see also Waterman, 983 A.2d at 847 (holding that the state was not bound to honor plaintiff's retirement benefits because its agent-director did not have the actual authority to make representations about the benefits that ignored a contrary state law); Martel, 982 A.2d at 600 (holding that a town could rescind a building permit that was granted by the town's agent-building-official who lacked the actual authority to waive the permit's condition precedent). Like the Casa DiMario town solicitor's settlement, theWaterman director's assurances, and the Martel building official's permit grant, this Court also finds that Moretti's alleged promise to compensate Plaintiff for the *Page 14 
difference between Moretti's offer and the School Committee's offer by July 1, 1995 was made without actual authority in contravention of School Committee policy and state law, and therefore, it is not binding on the Town. For the same reasons, this Court also finds that Moretti did not bind the Town when he allegedly informed Plaintiff that first-year administrators were compensated for all banked, unused vacation time upon their departure from the school district.
Similarly, the record in this case lacks any official delegation to School Committee member Lafleur of authority to contract with Plaintiff. Lafleur's status as a member of the School Committee, without more, did not give him authority to bind the School Committee or the Town. See Casa DiMario,763 A.2d at 612 (finding with respect to authorization, "neither the solicitor's alleged representations nor those of any individual council members or other town officials were those of `duly authorized representatives of the town'") (citations omitted);see also § 16-2-9.1(a)(10) (providing that individual board members do not have authority to bind school committee). Therefore, this Court finds that Lafleur's alleged promise to Plaintiff that he would be compensated for all vacation days that he had accrued prior to the adoption of the 1997 Policy was not contractually binding on the Town.
Accordingly, this Court holds that Plaintiff has failed to prove by a preponderance of the evidence that Moretti, as the Superintendent, or School Committee member Lafleur, acting individually, possessed actual authority to bind the Town to oral contracts as to Plaintiff's salary and benefits or compensation for unused vacation time. In addition, notwithstanding Plaintiff's testimony that he "was not a quitter" and felt that North Smithfield would ultimately compensate him based on the assurances made by Moretti and Lafleur, this Court finds that Plaintiff was optimistic as to his salary and benefits expectations, but unrealistic from the very beginning. Plaintiff never brought up salary during the preliminary negotiations for the position. In fact, *Page 15 
because this was his first attempt at a principalship, Plaintiff did not believe it was his place to bring up salary. Further, Plaintiff adamantly maintains that Moretti offered him $65,000 as a starting salary. However, crediting his assertion requires this Court to believe that the School Committee intended to pay afirst-year principal at the high end of the principalship's advertised salary range ($60,000-$68,000) and almost equivalent to Moretti's then-current superintendent salary ($65,500). (Exs. 2 4.) This Court will not make the required logical quantum leap. Similarly, this Court is unpersuaded that Plaintiff was compelled to accept the lower salary at the School Committee meeting because he had already given his notice to Pilgrim High School and his replacement was hired and trained. Plaintiff strains the bounds of credulity by suggesting that Pilgrim High School hired and trained a new assistant principal between early October 1994 — the date of Moretti's alleged offer — and October 18, 1994 — the date of the School Committee's confirmation. Thus, this Court is not convinced by Plaintiff's arguments that he was constrained to take the salary offered by the School Committee because his Pilgrim High School position was already filled by a new assistant principal. Finally, this Court notes that subsequent to taking the principal position, Plaintiff never pressed the School Committee over the course of six years to have a writing reflecting the allegedly actual conditions of his employment. Such inaction and tacit acquiescence further discredit Plaintiff's claims that he unwittingly accepted the salary and benefits offered by the School Committee. See Shepard Land Co. v. Banigan,36 R.I. 1, 1, 87 A. 531, 541 (R.I. 1913) ("The fact that consent is given may be shown by circumstantial evidence. Tacit acquiescence is enough.").
Accordingly, this Court finds that the terms of Plaintiff's employment with the Town were established by the School Committee's official actions during the School Committee meeting held on October 18, 1994. The School Committee voted unanimously to approve *Page 16 
Plaintiff's appointment as Principal of North Smithfield Junior-Senior High School with an annual salary of $62,000 for a 225-day work-year and a 20% co-payment for medical coverage. (Ex. 4.) Plaintiff has not alleged that any of these publicly approved terms has been violated.
 2 The 1997 Policy as an Implied Contractual Agreement i Payment for the Four Vacation Days
Plaintiff further argues that the School Committee's enactment of the 1997 Policy created an "implied agreement" between the parties regarding payment for the vacation days accrued during Plaintiff's final year of employment. The 1997 Policy provides: "If the administrator terminates employment on or after July 1st, then the administrator will be paid a per diem on vacation days accrued on a monthly pro-rated basis. . . ." (Ex. 14.) Plaintiff alleges that the School Committee violated its 1997 Policy by not compensating him for the four vacation days he accrued during July and August of 2000, his final two months of employment at North Smithfield High School.
An implied contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of and the communications between the parties."Marshall Contractors, Inc. v. Brown Univ.,692 A.2d 665, 669 (R.I. 1997). Basically the agreement arises "out of facts from which consent [to contract] may be inferred."Kenney Mfg. Co. v. Starkweather Shepley, Inc.,643 A.2d 203, 209 (R.I. 1994) (quoting Bailey v. West,105 R.I. 61, 64, 249 A.2d 414, 416 (1969)). In addition to consent, contracts implied-in-fact also must exchange consideration, as is required in express contracts. See Hayes v. PlantationsSteel, 438 A.2d 1091, 1094 (R.I. 1982). "In this jurisdiction, consideration consists either in some right, interest, or benefit accruing to one party or some forbearance, detriment, or responsibility given, suffered, or undertaken by the other."Id. In the instant case, Plaintiff argues that the 1997 *Page 17 
Policy was adopted by an implied agreement between the School Committee and the North Smithfield principals. School Committee member Mundy also acknowledged that the new policy was proposed by a committee of administrative personnel, including Plaintiff, and then was enacted by the School Committee in December 1997. (Ex. 23 at 44.) Accordingly, Plaintiff asserts that Town must honor the 1997 Policy because an implied contract for vacation time reimbursement was formed even though the 1997 Policy was not incorporated into employment contracts for the principals, nor was it necessary for every North Smithfield principal to assent to the terms of the new policy.
At the outset of this analysis, this Court acknowledges that Rhode Island courts are wary of implying contractual employment rights from policies present in "manuals, handbooks, or any other extra-contractual sources." Day v. City of Providence,338 F. Supp. 2d 310, 320 (D.R.I. 2004). Nonetheless, this Court also notes that our Supreme Court has not foreclosed the possibility of affording contractual relief using an implied contract theory[10]
provided the facts can establish a "reasonable belief or expectation" that an employment agreement exists. SeeNeri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006) (recounting how Roy v. Woonsocket Inst. *Page 18 for Sav., 525 A.2d 915, 918 (R.I. 1987), declined to decide whether this Court "should adopt the doctrine that `handbooks and personnel policies may give rise to contract rights in certain circumstances'") (emphasis added); see also Day v. City ofProvidence, 338 F. Supp. 2d 310, (D.R.I. 2004) (applying Rhode Island law and holding that the "[c]harter provisions that [Plaintiff] cites could not have given him any reasonableexpectation of an implied contract" without foreclosing the possibility that a handbook could create an implied contract on a different set of facts) (emphasis added); DelSignore v.Providence Journal Co., 691 A.2d 1050, 1052 (R.I. 1997) (rejecting plaintiff's implied contract theory, not because the theory is unavailable in Rhode Island, but because "[plaintiff] has not directed us to anything in the defendant's policies, practices, procedures, or employee memoranda that would give rise to areasonable belief that he was anything other than an at-will employee") (emphasis added).
Although Roy did not list the employment policy attributes that can give rise to the reasonable belief that a implied contract exists, [11] the Roy Court did set the precedent that "[i]f an employer notifies its employees that its policies aresubject to unilateral change, the employees can have nolegitimate expectation that any particular policy will remain in force." Roy v. Woonsocket Inst. for Sav.,525 A.2d 915, 918 (R.I. 1987) (emphasis added) (quotingDudkin v. Mich. Civil Serv. Comm'n,339 N.W. 2d 190, 195 (Mich. Ct. App. 1983)). In Roy, "the [employer's] handbook and manual specifically provided that the policies stated therein could be *Page 19 
altered or revoked by the [employer] at any time and for any reason. Thus it [could not] be said that [the employee] should have relied on any statements in the [employer's] handbook or manual."Id. Subsequent to Roy, Rhode Island case law further solidified the principle that employment policies do not confer contractual rights if there is a written disclaimer. SeeNeri, 897 A.2d at 48 (holding that "because [the handbook's disclaimer stated that] defendant unilaterally could change its policy concerning staff reduction, plaintiff did not have a contractual right [to invoke the handbook provision] to displace less senior employees. Accordingly, plaintiff's breach of contract claim [could not] survive summary judgment"); D'Oliveira v. RareHospitality Int'l, Inc., 840 A.2d 538, 541 (R.I. 2004) (holding that an employer was not required to pay severance to a terminated employee per an employment handbook provision because the handbook reserved the employer's right to revise all its policies, and therefore, the employee could not have a "legitimate expectation" that [the] severance policy would remain in force).
At the same time, though the presence of an explicit disclaimer succinctly forecloses implying a contractual agreement from an employment policy, Drans v. Providence College held that a college's unilateral authority to change a policy may be inferred in certain circumstances and likewise will prohibit contractual relief. 119 R.I. 845, 858, 383 A.2d 1033, 1040 (1978). InDrans, our Supreme Court held that due to the breadth of its contents, the Providence College Faculty Manual was not intended to be "all-inclusively" incorporated into binding faculty contracts; therefore, the college had the "inherent or reserved authority to make changes [to the manual] unilaterally" without the assent of the professors. Drans, 119 R.I. at 857, 383 A.2d at 1040 (positing that "contractual assent of every single faculty member [clearly was not] required before the college could, say, . . . change the discount rate being offered the faculty at the *Page 20 
campus book store[, a provision of the Faculty Manual]"). The Court also held that based on the academic community's custom and usage of "tenure" and the public policy reasons for instituting anexpiration on tenure, it was acceptable for Providence College to make its tenurial policies unilaterally alterable by including them in the Faculty Manual. Id.[12] Our Supreme Court found that the plaintiff-professor in Drans should have been aware of Providence College's inherent authority to make unilateral changes to the Faculty Manual at any time and could not assume that Providence College never would institute a mandatory retirement age. Id., 119 R.I. at 858, 383 A.2d at 1040. As such, the Faculty Manual's new tenure provision applied to the plaintiff-professor in Drans even though he never gave his explicit assent to its adoption. The Supreme Court did, however, hold that Providence College's "authority to institute a retirement policy for all its faculty members, including those with tenure, . . . [wa]s limited by an implied obligation to make reasonable transition provisions." Id.,119 R.I. at 858, 383 A.2d at 1040 (emphasis added). Accordingly, theDrans Court remanded, instructing the trial court to determine what compensation, if any, Professor Drans was entitled to "cushion the financial and emotional shock suffered by the professor's departure from academia's front lines." Id.,119 R.I. at 858-59, 383 A.2d at 1040.
With respect to the vacation days accrued pursuant to the 1997 Policy during Plaintiff's last year of employment, this Court finds that unlike the handbooks in Neri, Roy, andD'Oliveira, the 1997 Policy contained no express disclaimer stating that the School Committee could make *Page 21 
unilateral changes to the vacation policy. Furthermore, despiteDrans's holding that the unilateral authority to change personnel policies may be inherent, that case involved an unique policy issue — flexibility for instituting tenure provisions — and a private college's untethered decision-making authority. Conversely, the instant School Committee is bound by General Assembly legislation which explicitly requires school committees to "establish minimum standards for personnel" and "adopt personnel policies," § 16-2-9(a)(14), [13] and then "publish policy manuals which shall include all school committee policies." Sec. 16-2-9(a)(19). Section 16-2-32 also requires that "[a]ll school committees in the state will have a policy manual. The policy manual will have all school committee policies in writing, properly indexed, and kept up to date. The policy manuals will be a sourceused to govern each school system." Sec. 16-2-32 (emphasis added). If General Assembly intended to regard a school committee's currently enacted policies as wholly illusory, unilaterally alterable without notice, and not at all reliable by school personnel, it is inconceivable why the legislature would expressly direct school committees to establish policy, publish existing operating procedures and then demand that these policies be the source of school system governance.See State v. DeMagistris, 714 A.2d 567, 573 (R.I. 1998) ("One of the fundamental canons of statutory construction observed by this Court is that no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage."); Cocchini v. City of Providence,479 A.2d 108, 111 (R.I. 1984) *Page 22 
("[The Supreme Court] will not ascribe to the Legislature an intent to enact legislation that is devoid of any purpose, is inefficacious, or is nugatory.").
This Court is mindful that the General Assembly affords school committees significant leverage to conduct the affairs within their school systems. See § 16-2-9(a) ("The entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns."); Asadoorian v. Warwick Sch.Comm., 691 A.2d 573, 578 (1997) ("[S]chool committees have authority to make whatever provisions they deem proper regarding leaves of absence.") (internal citation omitted); Greenhalgh v.City Council of City of Cranston, 603 A.2d 1090, 1093 (R.I. 1992) (collecting cases and acknowledging "the extensive power over public school affairs that school committees have been afforded under our statutes"). Nonetheless, this Court finds that a school committee's broad authority run its school system is distinguishable from the unilateral authority relied on by theRoy employment handbook cases and Drans. Clearly, theRoy cases hinged on the fact that there was an explicit, written disclaimer on the employment policy itself. If an employer declares its unilateral authority to make changes, then the employee is on notice that he or she cannot rely on the policy in any way. Here, the 1997 Policy contained no such written disclaimer that put the Plaintiff on notice that he could not rely on the provisions for vacation day reimbursement. Further, the General Assembly expressly mandates that school committee's published policies are used as the source of school governance. Neither an employer, nor a private college, like Providence College inDrans, is bound by similar General Assembly requirements for their currently enacted policies. As such, it is elementary that a school committee's authority over its policies cannot be so far reaching as to make the policies completely illusory, like the handbooks in the Roy cases. In addition, when Plaintiff resigned *Page 23 
from the Town at the end of August 2000, it is undisputed that the 1997 Policy remained in full effect and the School Committee was enforcing other provisions within the 1997 Policy.[14] It follows that the School Committee lacked the inherent authority to act arbitrarily by applying some provisions of the 1997 Policy, but not others.[15] See Subryan v. Regents of Univ. ofColo., 698 P.2d 1383, 1385 (Colo. App. 1984). ("Although it is true that . . . the [university board of] regents have the nondelegable authority to appoint and not appoint, we cannot agree that they can ignore their own laws which mandate that senior instructor reappointments be for three years. These rules were adopted by the regents and are relied upon by all who are affected. They must be given effect and cannot be disregarded or thought of as advisory merely because funding problems have arisen.");see also Wyatt v. Avoyelles Parish Sch. Bd.,831 So.2d 906, 915 (La. 2002) (holding that "it was the Board's failure to compensate plaintiffs for the vacation pay that accrued under the terms of the policy, i.e., unused annual leave earned in the year prior to their retirement and any annual leave earned during the year of their retirement, that violated these statutory provisions [which require an employer to pay a resigning an employee "the amount then due under the terms of employment."]). As such, this Court finds that the currently enacted 1997 Policy is not wholly illusory and Plaintiff's implied contract theory clears its first hurdle.
In the absence of an explicit disclaimer or the inherent authority to act unilaterally in this particular case, this Court next determines whether — based on the circumstances surrounding the policy's enactment and the conduct of the parties — Plaintiff had a "reasonable belief" that the 1997 Policy was an implied contract.See Marshall Contractors, Inc., 692 A.2d at 669 (stating *Page 24 
that an implied contract is "determined from the relations of and the communications between the parties"); see alsoNeri, 897 A.2d at 48 (not reaching the issue of a reasonable belief based on circumstances and conduct because the "handbook and manual specifically provided that the policies stated therein could be altered or revoked by the [employer] at any time and for any reason"). Here, the School Committee, upon a proposal by a committee of administrative personnel, which included Plaintiff, enacted the 1997 Policy during a December 1997 School Committee meeting. In accordance with the new vacation policy, all of the Town's school principals were required to relinquish the benefits of an unwritten practice that permitted administrators to carry over five unused vacation days from a current school year to the following year. (Ex. 14.) In exchange, some principals, including Plaintiff, received an additional three vacation days to augment their total vacation time to twenty-five days per fiscal year. Id. Other principals, who already had accrued more than twenty-five days of vacation time, were grandfathered into retaining any days in excess of twenty-five, but were not allowed to carry over any new days starting in the 1998-1999 school year. Id. These provisions were adopted without every administrator's assent, and the 1997 Policy was not explicitly incorporated into an employment contract for the Town's principals. Further, there is no indication that any principal had the option to opt out of the new 1997 Policy.
This Court holds that the adoption of the 1997 Policy meets the requirements of an implied contract. Because representatives of the administrative personnel proposed a definitive vacation policy to replace all unwritten practices and because there was a discussion and acceptance of the terms by the School Committee before the 1997 Policy was reduced to a writing, the School Committee exhibited the obvious intent to create a lasting, predictable method to manage administrators' vacation time. The School Committee could have continued *Page 25 
to operate under their prior vacation practice and retained the full discretion to act at their pleasure with regard to vacation time reimbursement but, instead, the School Committee explicitly chose to create a written policy and then distribute it to the school principals. This act strongly evinces that the School Committee is bound by the provisions therein. SeePundt v. Millikin Univ., 496 N.E.2d 291, 294 (Ill. App. 1986) ("There was no obligation on the part of the defendant university to prepare the staff handbook. It did, and the employee had a right and expectation that the policy manual would be followed."). In addition, as soon as the 1997 Policy was enacted, the School Committee further indicated its consent to contract by enforcing the terms of the 1997 Policy.[16] SeeBailey v. West, 105 R.I. 61, 64, 249 A.2d 414, 416 (R.I. 1969) (stating "there must be a manifestation of assent arising wholly or in part from acts other than words, and a contract cannot be implied in fact where the facts are inconsistent with its existence" (quoting 17 C.J.S. Contracts § 4)); Shepard Land Co,36 R.I. at 1, 87 A. at 541 ("The fact that consent is given may be shown by circumstantial evidence."). The School Committee's subsequent actions were consistent with the recognition that an agreement for administrator's vacation time had been reached.
Accordingly, this Court finds that the School Committee impliedly consented to contract for this new vacation policy and required adherence to its terms. See Kenney Mfg. Co.,643 A.2d at 209 (stating that an implied contract can be found through "facts from which consent [to contract] may be inferred"). Further, because the principals relinquished their ability to carryover vacation days and the Town provided some principals with more vacation days than they previously maintained while grandfathering other principals, there was consideration to *Page 26 
memorialize the implied agreement. See Hayes,438 A.2d at 1094 (stating that consideration for a contract includes "forbearance, detriment, or responsibility given, suffered, or undertaken").
As such, by arbitrarily deciding that the Town would not pay Plaintiff for the four vacation days he accrued during his final year of employment, the School Committee breached the implied contract. Pursuant to Policy Item (4) Plaintiff had "terminate[d] his employment on or after July 1st," when he resigned in August 2000. Accordingly, the School Committee should have "paid [Plaintiff] a per diem on vacation days accrued on a monthly pro-rated basis." (Ex. 14.) By requesting payment for these four days, Plaintiff is not attempting to carry over vacation time from a prior school year, which would be in contravention of Policy Item (2) that states that "[n]o administrator/director will be allowed to carry-over any vacation days in the 1998-1999 fiscal year and into subsequent years." (Ex. 14.) Plaintiff is simply calling for the School Committee to apply the currently enacted 1997 Policy provisions as written and pay him for the vacation time accrued in July and August of 2000. This Court agrees with Plaintiff and holds that the School Committee is obligated to compensate Plaintiff for the four vacation days accrued during his last fiscal year of employment pursuant to the 1997 Policy, which was in effect at the time of Plaintiff's resignation in August 2000.
 ii Vacation Days Accrued Prior to the 1997 Policy
Plaintiff also contends that he is entitled to vacation days accrued prior to the adoption of the 1997 Policy pursuant to an implied agreement emanating from Moretti's statements concerning payment for vacation days accrued during Plaintiff's first year and comments made by Lafleur regarding payment for vacation days accrued before the 1997 Policy's enactment. See MarshallContractors, Inc, 692 A.2d at 669 (R.I. 1997) (stating that a contract implied in fact "is a form of express contract wherein the elements of the contract are found in and *Page 27 
determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document"). However, as stated above, this Court has found no evidence that Moretti or Lafleur possessed the actual authority necessary to contractually bind the Town to their statements. See Casa DiMario, 763 A.2d at 610-12;see also Waterman, 983 A.2d at 847 (state not contractually bound where state's agent-director did not have the actual authority to make statements that ignored a contrary state law); Martel, 982 A.2d at 600 (town permitted to rescind permit where town's agent-building-official lacked the authority to grant a building permit that did not meet the zoning ordinance's required condition precedent). In addition, Plaintiff also has failed to produce any reliable and persuasive documentation reflecting the Town's policy of compensating administrators for unused vacation time accrued in prior years. SeeD'Oliveira, 840 A.2d at 541 (holding that an employee could not have a "legitimate expectation" that the severance policy located in the employee handbook would remain in force; therefore his employer was not required to pay severance when he was terminated); DelSignore, 691 A.2d at 1052 (finding that an implied contract theory was inapplicable where "[plaintiff] has not directed [this Court] to anything in the defendant's policies, practices, procedures, or employee memoranda that would give rise to a reasonable belief that [plaintiff] was anything other than an at-will employee").
Plaintiff points to the 1997 Policy as documentation of the Town's policy of compensating administrators for unused vacation time. However, the 1997 Policy has no provisions that allow payment for unused vacation time accrued prior to its enactment. Policy Item (2) simply provides: "The current practice of five (5) carry-over days will cease at the end of the 1997-1998 fiscal year (June 20, 1998). No administrator/director will be allowed to carryover any vacation days in the 1998-1999 fiscal year and into subsequent years." (Ex. 14.) Policy *Page 28 
Item (4) states: "If the administrator/director terminates employment on or after July 1st, then the administrator/director will be paid a per diem on vacation days accrued on a monthly pro-rated basis." Id. Accordingly, the School Committee's written policies clearly state that there is no vacation day carry-over from year-to-year. An administrator is paid for any unused, current-year vacation days at termination, but not at the end at each fiscal year. Because Plaintiff was not grandfathered and is not allowed to carry over any vacations days from previous years, it follows that the 1997 Policy does not permit payment for these previously accumulated days when Plaintiff resigns.
Additionally, neither Mundy nor Lafleur testified to a general policy of paying administrators for the unused vacation days at the end of every year of their employment. Mundy and Lafleur did recall an isolated practice — in place before the 1997 Policy — whereby the School Committee would pay administrators for any unused vacation days when they resigned. (Ex. 21 at 31; Ex. 23 at 47.) However, this Court finds that by relying on the unauthorized statements of Moretti and Lafleur without any accompanying documentation and in direct contravention of the current 1997 Policy, Plaintiff could not form the "reasonable belief" that he had an implied agreement with the Town entitling him to compensation for unused vacation days accrued prior to the enactment of the 1997 Policy. See DelSignore,691 A.2d at 1052; D'Oliveira, 840 A.2d at 541.
 B Promissory Estoppel (Count IV) 1 Statements of Mundy, Lafleur and Moretti
"Promissory estoppel operates to make a promise binding if the promise was `[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person,' the promise `does induce such action or forbearance' in reliance on *Page 29 
that promise, and `injustice can be avoided only by enforcement of the promise.'" Dellagrotta v. Dellagrotta,873 A.2d 101, 110 (R.I. 2005) (quoting Filippi v. Filippi,818 A.2d 608, 625 (R.I. 2003) (internal citation omitted)). "To invoke the doctrine of promissory estoppel, a promisee must demonstrate the existence of: `1. A clear and unambiguous promise; 2. Reasonable and justifiable reliance upon the promise; and 3. Detriment to the promisee, caused by his or her reliance on the promise.'" Id. (quoting Filippi, 818 A.2d at 626). Just as actual authority is necessary for a public official to form a valid contract, actual authority is a prerequisite for a party to invoke promissory estoppel against the government. Our Supreme Court clarified that "`[e]stoppel against a municipal corporation growing out of affirmative action must be predicated upon the acts orconduct of its officers, agents or official bodies acting within thescope of their authority.'" Romano v. Retirement Bd. of theEmployees' Retirement System of the State,767 A.2d 35, 41 (R.I. 2001) (emphasis in original) (quotingFerrelli v. Department of Employment Security,106 R.I. 588, 592-93, 261 A.2d 906, 909 (1970)); see alsoMancuso v. City of Providence, 685 A.2d 279 (R.I. 1996) (holding that doctrine of promissory estoppel could not be applied to a fiscal officer for the Department of Public Safety because he did not have the authority to make a promise upon which the plaintiff could reasonably rely) (internal citation omitted)). Our Supreme Court further noted that "`courts are reluctant to invoke estoppel against the government on the basis of an action of one of its officers.'" Casa DiMario, 763 A.2d at 612 (quotingLerner v. Gill, 463 A.2d 1352, 1362 (R.I. 1983));Romano, 767 A.2d at 39 (quoting D. Corso Excavating,Inc. v. Poulin, 747 A.2d 994, 1001 (R.I. 2000) ("[N]otions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis."). *Page 30 
Essentially, without actual authority, a promisee may not justifiably rely on the promise of a public official. "[A] person's failure to discover the true scope of a government agent's authority will not provide any grounds to relieve that person's detrimental reliance upon the agent's representations or actions."Romano, 767 A.2d at 43 (citations omitted); seealso Waterman, 983 A.2d at 846 (holding that "[t]his Court will not entertain an estoppel claim when a governmental employee's actions clearly are ultra vires"); Martel, 982 A.2d at 600 (holding that the plaintiff could not detrimentally rely on his already-issued building permit where building official had unlawfully granted the permit in contravention of a zoning ordinance provision). In Casa DiMario, the local business argued that the town should be equitably estopped from vacating the settlement or enforcing entertainment ordinances because the business had relied on private discussions with individual town council members, the town clerk, and the town solicitor who all assured the business that its right to have nude-dancing would be "grandfathered" against the town's anti-nudity ordinances.Id. at 610-11. The business also claimed that it relied on the town's past practice of allowing the solicitor to settle cases.Id. Our Supreme Court found that "[c]ommunications, representations, and alleged acts of this kind are insufficient as a matter of law to bind a municipality to future acts or inaction."Id. at 611 (citing Sch. Comm. of Providence,429 A.2d at 1302); see also Martel, 982 A.2d at 600 (citing Town of Johnston v. Pezza,723 A.2d 278, 283 (R.I. 1999)) (establishing that even if a building official almost uniformly ignores the requirements of a zoning ordinance when granting building permits, an estoppel theory will not prevent a town from later rescinding a permit that was granted via the official's ultra vires method). Noting that the town council had not issued any resolutions authorizing the town solicitor to settle the litigation, that the town charter did not *Page 31 
grant him such authority, and that did the individual council members and other town officials did not possess the singular authority to bind the town, the Casa DiMario Court held that
 any putative detrimental reliance by [the business] on the town's alleged past practice of settling lawsuits via its solicitor without specifically authorizing him to do so and on the representations of any individual council members, the solicitor, or the town clerk concerning whether the council would `grandfather' [the business] against enforcement of the town's present and future anti-nudity ordinances would not have been justified. Id. at 613 (citations omitted).
The instant Plaintiff also invokes the doctrine of promissory estoppel to bind the Town to Moretti's statements regarding salary, vacation time, co-pay for medical benefits, and an advanced degree stipend for his first year, as well as to Lafleur's comments concerning compensation for unused vacation days. Plaintiff has failed to prove by a preponderance of the evidence that Moretti, acting as Superintendent, or School Committee member Lafleur, acting individually, possessed actual authority to bind the School Committee. The record lacks evidence of any official actions on behalf of the School Committee delegating the authority to Moretti or Lafleur to make binding promises to Plaintiff.See Casa DiMario, 763 A.2d at 611. Moreover, it was incumbent on Plaintiff to discover the scope of Moretti and Lafleur's authority. See Romano, 767 A.2d at 43. Any reliance on unauthorized statements made by Moretti or Lafleur was not justifiable. See Casa DiMario, 763 A.2d at 613.
Plaintiff also conceded at trial that he knew that the School Committee was the appointing body of the Town, and that it alone possessed the authority to hire him. The School Committee's past practice of adhering to the Superintendent's recommendation as to administrators' salaries and benefits is "insufficient as a matter of law to bind [the Town] to *Page 32 
future acts." Id. at 611. Thus, this Court finds that Plaintiff's putative detrimental reliance[17] on any statements made by Moretti or Lafleur, any past practices of the School Committee was not "reasonable and justifiable" as required by promissory estoppel doctrine. See Dellagrotta,873 A.2d 101, 110. As Plaintiff could not thus reasonably or justifiably rely on Moretti and Lafleur's statements, his promissory estoppel claim fails.
 2 The 1997 Policy and Promissory Estoppel
This Court has determined that the School Committee is contractually obligated to honor the currently enacted 1997 Policy. Accordingly, this Court finds that Plaintiff is also entitled to rely on the 1997 Policy's written provision that promised compensation for unused vacation days accrued during an administrator's final year of employment. SeeFilippi, 818 A.2d at 625 ("[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, [and therefore] is binding if injustice can be avoided only by enforcement of the promise" quoting Alix v.Alix, 497 A.2d 18, 21 (R.I. 1985)).
The 1997 Policy was enacted by the School Committee possessing the actual authority to bind the Town.See § 16-2-9.1(a)(10) (school committee acts are binding if proceeding collectively at "public meetings since individual board members have no authority to bind the board"). Policy Item (4) was a "clear and unambiguous promise" that the Town would reimburse resigning administrators for any unused vacation time accrued during their last year of employment, provided the administrator resigned after July 1st. See Dellagrotta, 873 A.2d at 101, 110. *Page 33 
Plaintiff reasonably and justifiably relied upon the promise because he did not expect the School Committee to simply ignore the currently viable policy it enacted three years prior to Plaintiff's instant request. Id. Plaintiff suffered detriment in reliance of the promise because he neither enjoyed his vacation days by taking time off, nor received compensation for their benefit.Id. Accordingly, Plaintiff's putative detrimental reliance on the 1997 Policy establishes the elements of the promissory estoppel doctrine, and entitles him to payment for the four vacation days he accrued, but did not use during his final year at North Smithfield Junior-Senior High School.
 C Fraud (Count V)
In addition to breach of contract and promissory estoppel claims, Plaintiff asserts that the Town is liable for fraud. Specifically, Plaintiff argues that the School Committee intentionally did not honor the agreement that it authorized Moretti to make with him. Plaintiff also contends that the School Committee intended to deceive him through Lafleur's representation that Plaintiff would be "grandfathered" under the 1997 Policy while actually having no intention to eventually compensate him for accrued vacation days. Id. at 21.
The Rhode Island Supreme Court has stated that "[t]o establish a prima facie damages claim in a fraud case, the plaintiff must prove that the defendant `made a false representation intending thereby to induce plaintiff to rely thereon' and that the plaintiff justifiably relied thereon to his or her damage." Travers v. Spidell,682 A.2d 471, 472-73 (R.I. 1996) (quoting Cliftex ClothingCo. v. DiSanto, 88 R.I. 338, 344, 148 A.2d 273, 275 (1959)) (further citation omitted); see alsoFrancis v. Amer. Bankers Life Assur. Co. of Fla.,861 A.2d 1040, 1046 (R.I. 2004) (establishing that the "plaintiff had the burden of proving that defendant `in making the statement at issue, knew it to be false and intended to deceive, thereby inducing [plaintiff] to rely *Page 34 
on the statements to [her] detriment'") (citation omitted). Thus, under Rhode Island law, to establish fraud, a plaintiff must have justifiably relied on the defendant's statement. This Court finds the record lacking any evidence that the School Committee, Moretti, or Lafleur knew their representations were "false and intended to deceive" Plaintiff. See Francis, 861 A.2d at 1046.
Under Rhode Island law, to establish fraud, a plaintiff must have justifiably relied on the defendant's statement. Here, Plaintiff has failed to prove by a preponderance of the evidence that Moretti, acting as Superintendent, or School Committee member Lafleur, acting individually, possessed actual authority to bind the School Committee. It was incumbent on Plaintiff to discover the scope of Moretti and Lafleur's authority. SeeRomano, 767 A.2d at 43. Any reliance on unauthorized statements made by Moretti or Lafleur was not justifiable.See Casa DiMario, 763 A.2d at 613; see alsoWaterman, 983 A.2d at 846; Martel, 982 A.2d at 600. In addition, Plaintiff stated that he knew that only the Town, and not Moretti, had the ability to hire him. The record also supports his statement because Plaintiff waited two days after the School Committee had confirmed his position at North Smithfield Junior-Senior High School before he resigned from Pilgrim High School. Had Plaintiff truly relied on Moretti's statements, he would have resigned in early October 1994 when Moretti supposedly offered him the higher paying salary, rather than waiting until the School Committee made its final decision. As such, this Court finds that Plaintiff could not and did not justifiably rely on any statements made by Moretti or Lafleur regarding the terms and conditions of his employment with the Town to establish fraud.[18]See Travers, 682 A.2d at 472-73. *Page 35 
 D Negligent Misrepresentation (Count VI)
Plaintiff argues, in the alternative, that if the School Committee did not intentionally defraud him, its actions constitute negligent misrepresentation. Specifically, Plaintiff asserts that the School Committee negligently allowed Moretti to appear to have authority to reach an agreement with him and should have made it clear that Moretti did not have such authority. Id. Also, Plaintiff argues that the School Committee negligently represented, through Lafleur, that he would be "grandfathered" under the 1997 Policy and entitled to compensation for his unused vacations days accrued prior to the adoption of the 1997 Policy. Id. at 22-23.
With respect to establishing a prima facie case of negligent misrepresentation, the Rhode Island Supreme Court has explained:
 `[T]he plaintiff must establish the following elements: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.' Manchester v. Pereira, 926 A.2d 1005, 1012 (R.I. 2007) (quoting Mallette v. Children's Friend and Service, 661 A.2d 67, 69 (R.I. 1995)).
As with fraud, to establish negligent misrepresentation, a plaintiff must have justifiably relied on the defendant's representation. Thus, this Court's analysis as to fraud is equally applicable to negligent misrepresentation. Any reliance on unauthorized statements made by Moretti or Lafleur was not justifiable, see Casa DiMario, 763 A.2d at 613, and Plaintiff has not *Page 36 
proven that he actually relied on Moretti's statements considering he waited until the School Committee's confirmation before resigning from his position at Pilgrim High School. Thus, this Court finds that Plaintiff could not and did not justifiably rely on any statements made by Moretti or Lafleur regarding the terms and conditions of his employment with the Town to establish negligent misrepresentation. See Manchester, 926 A.2d at 1012.
 E Conspiracy (Count VII)
Plaintiff has also asserted two claims deriving from his other tort claims: conspiracy and aiding and abetting. As to the former, he argues that the School Committee members conspired with one another in committing fraud. Specifically, Plaintiff asserts that the School Committee conspired against him by giving Moretti the authority to extend a job offer to him or at least created the appearance that such authority existed, without intending to actually permit Moretti to use that authority. Id. Plaintiff also argues that the School Committee members conspired when they refused to compensate him for his unused vacation time, following assertions that he would be paid. Id.
Our Supreme Court has explained: "To prove a civil conspiracy, plaintiffs had to show evidence of an unlawful enterprise. Furthermore, civil conspiracy is not an independent basis of liability. It is a means for establishing joint liability for other tortious conduct; therefore, it `requires a valid underlying intentional tort theory.'" Read Lundy,Inc. v. Washington Trust Co. of Westerly,840 A.2d 1099, 1102 (R.I. 2004) (quoting Guilbeault v. R.J.Reynolds Tobacco Co., 84 F.Supp.2d 263, 268 (D.R.I. 2000)) (internal citations omitted).
This Court notes that of the two previous torts that Plaintiff alleges, fraud and negligent misrepresentation, only fraud requires a showing of intent. See Travers, 682 A.2d at 472-73. Thus, to successfully prove conspiracy, which requires a "valid underlying intentional tort *Page 37 
theory," he must demonstrate that members of the School Committee defrauded him. See Read Lundy, 840 A.2d at 1102. This Court has found, however, that Plaintiff cannot successfully prove fraud on behalf of the School Committee because he could not justifiably rely on Moretti's and Lafleur's statements.See Travers, 682 A.2d at 472-73. This Court also finds that the record contains no evidence that the School Committee, Moretti, or Lafleur knew their representations "to be false and intended to deceive," as required to prove fraud. SeeFrancis, 861 A.2d at 1046. Thus, Plaintiff's inability to prove an underlying intentional tort theory precludes finding the Town liable for civil conspiracy. SeeRead Lundy, 840 A.2d at 1102.
This Court further notes that in establishing a civil conspiracy, a plaintiff must show an unlawful enterprise. SeeRead Lundy, 840 A.2d at 1102; see also Stubbs v.Taft, 88 R.I. 462, 468, 149 A.2d 706, 709 ("In order to establish a conspiracy evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise."). This Court has before it no evidence establishing the "joint assent" of the School Committee and either Moretti or Lafleur. In fact, Lafleur testified that some School Committee members were unhappy with Moretti when he recommended a $65,000 salary for Plaintiff. (Ex. 23 at 34.) He testified, "[I] remember sitting there kind of dumbfounded, because there was no specific salary ever indicated to Mr. Moretti that he had the ability to negotiate without coming to us first." Id. There is also no evidence of any agreement between the School Committee and Lafleur directing Lafleur to misrepresent the effect of the 1997 Policy on Plaintiff's unused vacation days. Accordingly, this Court finds that the evidence fails to establish the "joint assent of the minds of two or more parties to the prosecution" of fraud. See Stubbs,88 R.I. at 468, 149 A.2d at 709. *Page 38 
 F Aiding and Abetting (Count VIII)
Plaintiff has also asserted the derivative tort of aiding and abetting. He argues that the School Committee has aided and abetted one another in defrauding Plaintiff. Specifically, Plaintiff contends that the School Committee acted in concert by giving Moretti the authority to extend a job offer to him, or at least created the appearance that Moretti had that authority, while not intending to permit Moretti to use that authority.Id. Plaintiff also claims that the School Committee acted in concert when it refused to compensate him for unused vacation days despite assurances that he would be paid for them. Id.
Our Supreme Court, extrapolating Rhode Island's criminal act of aiding and abetting to the civil context, requires that the plaintiff prove a "community of unlawful purpose" and that the alleged aider and abettor shared the intent of the principal.Curtin v. Lataille, 527 A.2d 1130, 1133 (R.I. 1987). This Court also notes that to establish civil aiding and abetting liability for another's tortious conduct, a plaintiff must demonstrate "substantial assistance or encouragement" to the principal. See Ames v. Oceanside Welding Towing Co.,Inc., 767 A.2d 677, 681 (R.I. 2001) (establishing that one aids and abets when one "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself") (citation omitted)).
To successfully prove aiding and abetting, which requires a showing of shared intent with the principal, Plaintiff must demonstrate that the members of the School Committee intended to defraud him. See Curtin, 527 A.2d at 1132. This Court has found, however, no evidence that the School Committee, Moretti, or Lafleur knew his representations "to be false and intended to deceive," as required to successfully prosecute a claim of fraud.See Francis, 861 A.2d at 1046. Thus, Plaintiff's failure to prove that the School Committee members possessed a shared intent *Page 39 
to commit fraud precludes a finding that the Town is liable for aiding and abetting. See Curtin, 527 A.2d at 1132.
The law of aiding and abetting also requires a showing of the defendant's substantial assistance or encouragement to the principal in furtherance of the principal's tortious conduct. SeeAmes, 767 A.2d at 681. This Court has before it no evidence that the School Committee granted Moretti or Lafleur authority to bind the School Committee. Accordingly, this Court finds that Plaintiff's claim that the School Committee substantially assisted or encouraged either Moretti or Lafleur in conduct that it knew to be tortious fails. See id.
 G Punitive Damages (Count IX)
Finally, Plaintiff requests that this Court award him punitive damages. "`The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages.'"Cady v. IMC Mortg. Co., 862 A.2d 202, 219-220 (R.I. 2004) (quoting Mark v. Congregation Mishkon Tefiloh,745 A.2d 777, 779 (R.I. 2000) (further citation omitted)). In addition, courts may only award punitive damages "upon evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounted to criminality, which for the good of society and warning to the individual, ought to be punished."Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993) (quotingSherman v. McDermott,114 R.I. 107, 109, 329 A.2d 195, 196 (R.I. 1974)). Because the Town was not liable on all but a small portion of Plaintiff's claims, justifying a minimal compensatory damage award, this Court finds that the Town's conduct does not rise to a level of "criminality" and does not require additional deterrence and punishment. As such, punitive damages are not applicable in this case. *Page 40 
 IV Conclusion
Based on the evidence and memoranda submitted and for the reasons stated above, this Court finds that Plaintiff's claims of breach of contract, promissory estoppel, fraud, negligent misrepresentation, conspiracy, and aiding and abetting fail for all demands except the reimbursement of the four vacation days Plaintiff accrued during the 1999-2000 school year. As to Plaintiff's breach of contract theory and the promissory estoppel doctrine, this Court agrees that Plaintiff is entitled to reimbursement for these four days in accordance with Policy Item (4) of the 1997 Policy. However, because Plaintiff was only marginally successful on a small portion of two claims and this Court did not find that the Town's conduct was deserving of additional deterrence and punishment, this Court denies his request for punitive damages.
Counsel shall submit appropriate judgment for entry in accordance with this decision.
[1] By agreement, Count II for Declaratory Judgment — that the 1997 Policy was not adopted pursuant to proper North Smithfield School Committee policy — was voluntarily dismissed with prejudice by an order entered on October 15, 2007, following a hearing on September 18, 2007.
[2] This Court notes that "original jurisdiction of controversies in public school matters [is not] vested exclusively by [C]hap. 39 of title 16 in the commissioner [of elementary and secondary education] and the board [of regents for elementary and secondary education]. . . . [The] administrative review authorized in that chapter does not exclude other legal remedies."Demers v. Shehab,101 R.I. 417, 419, 224 A.2d 380, 382 (R.I. 1966); seealso G.L. 1956 § 16-39-5 ("Nothing contained in this chapter [Controversies in School Matters, Chapter 39] shall be construed as to deprive any aggrieved party of any legal remedy.");O'Connor v. McKanna, 412 A.2d 273 (R.I. 1980) (reinstating to the trial calendar a contract dispute between the West Warwick School Committee and its superintendent even though the superintendent had not exhausted all possible administrative remedies).
[3] Policy item (2) provides: "Currently employed administrators, who exceed the maximum number of vacation days defined in this policy, will not have their vacation days reduced in number as a result of this policy. Upon their termination of employment, their replacements will be subject to this policy." (Ex. 14.)
[4] Policy item (4) provides in pertinent part:
 If the administrator/director terminates employment on or after July 1st, then the administrator/director will be paid a per diem on vacation days accrued on a monthly pro-rated basis, i.e., the allowable number of days divided by twelve months. Per diem will be defined as actual number of days divided by twelve months. Per diem will be defined as actual number of days in the fiscal year minus allowable vacation days, week-ends, and paid holidays. (Ex. 14.)
[5] The relevant minutes of the June 20, 2000 meeting state:
 Principal K. Sheehan submitted a request that the Committee consider issuing payment to him for unused vacation days during the 1999-2000 school year. Mr. Sheehan explained that it has been difficult to take his contractually allotted vacation days due to the nature of the principalship and the lack of time. During the discussion period, it was noted that the existing School Board Policy had been adopted through recommendation of the administrative team and it would be setting poor precedence to approve a waiver in this instance.
 On motion made by J. Mundy, seconded by P. Vadenais, the Committee unanimously voted to deny Mr. Sheehan's request for payment of unused vacation days, in order to maintain the continuity with past action(s) of the Board. (Ex. 17 ¶ 22.)
[6] Defendants Christine A. Charest, Paul E. Vadenais, Gary S. Ezovski, Jonathan A. Mundy, and Jean B. Meo, in their capacities as members of the North Smithfield School Committee, and Richard Scherza, in his capacity as Superintendent of Schools, were dismissed from this case by an order entered on October 31, 2002, following a hearing on October 22, 2002.
[7] The Plaintiff's Complaint also contained Count II, seeking declaratory judgment. However, this count was voluntarily dismissed with prejudice by an order entered on October 15, 2007.
[8] The Restatement (Second) of Agency defines authority as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him. Restatement (Second)Agency § 7 (1958). Such actual authority "can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."Id. § 26. Apparent authority is defined as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Id. § 8.
[9] Plaintiff argues that pursuant to the spoliation doctrine and the Town's inability to produce the minutes of the October 18, 1994 closed session, this Court may infer that those minutes would have yielded information unfavorable to the Town.See Kurczy v. St. Joseph's Veterans' Ass'n, Inc.,820 A.2d 929, 947 (R.I. 2003) (establishing that a fact finder may draw an adverse inference if meeting minutes are deliberately or negligently made unavailable by the defendant). Because this Court finds credible the testimony of Lafleur, Mundy, and Moretti, and declines to infer that minutes of the October 18, 1994 closed session or any other closed session would have yielded information contradicting their testimony and evidencing Moretti's actual authority to contract with Plaintiff, it need not determine that the minutes were made unavailable intentionally or negligently by the Town.
[10] Assuredly, other jurisdictions have implied contractual rights from employment policies if the circumstances so warrant.See, e.g., Straughn v. Delta Air Lines, Inc.,250 F.3d 23, 45 n. 11 (1st Cir. 2001) ("Thus, statements in employee handbooks regarding benefits may give rise to enforceable contracts under New Hampshire law."); Hinchey v. NYNEX Corp.,144 F.3d 134, 141 (1st Cir. 1998) (quoting Derrig v. Wal-MartStores, Inc., 942 F. Supp. 49, 55 (D. Mass. 1996) ("Stated another way, these [Jackson v. Action for Boston Cmty. Dev.,Inc., 525 N.E.2d 411 (Mass. 1988] factors help determine if an employee could reasonably have believed that the `employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer.'");Martinez v. Safeway Stores, Inc., No. CV 08-2169-PHX-JAT,2009 WL 3682593 at *4 (D. Ariz. Nov. 2, 2009) (quotingRoberson v. Wal-Mart Stores, Inc.,44 P.3d 164, 169 (Ariz. Ct. App. 2002)) ("In Arizona, implied-in-fact terms may be found in an employer's policy statements regarding job security or employee disciplinary procedures, such as those contained in personnel manuals or memoranda" provided there is no written statement disclaiming all contractual rights); Leikvold v. Valley View Cmty. Hosp.,688 P.2d 170, 174 (Az. 1984) ("Evidence relevant to this factual decision [whether an implied contract exists] includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding [the policy provision]."); Duldulao v. Saint Mary of Nazareth Hosp.505 N.E.2d 314, 318 (Ill. App. 1987) ("First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.").
[11] The Massachusetts Supreme Judicial Court articulated a list of factors to consider when evaluating whether an employment policy creates an implied contract between an employer and employee:
 [N]o implied contract based on the terms of the personnel manual existed where: 1) the employer retained the right to unilaterally modify terms; 2) the terms of the manual were not negotiated; 3) the manual stated that it provided only guidance regarding the employer's policies; 4) no term of employment was specified in the manual; 5) the employee did not sign the manual to manifest assent. . . . The SJC has clarified that these factors are not an inflexible list, but rather a set of circumstances which would "make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." Hinchey, 144 F.3d at 141 (internal citations omitted).
[12] Basically, the Drans Court determined that the primary purposes of tenure only include "protect[ing] a teacher from dismissal" and "preserv[ing] academic freedom" by "encouraging a scholar to vigorously pursue and disseminate his research without fear of reprisal or rebuke from those who support the conventional wisdom." Id., 119 R.I. at 856-57, 383 A.2d at 1039. These general purposes did not prevent a college from instituting policies that effected an expiration of tenure. Id. TheDrans Court also found that an overarching public policy interest for "institutional flexibility" permitted universities to cite "retirement for age as a permissible ground for the termination of tenured professors." Id.,119 R.I. at 858, 383 A.2d at 1040. As such, Providence College was within its authority to affect tenured professors by unilaterally adding a "reasonable, uniformly applicable, mandatory retirement policy" to its Faculty Manual. Id.
[13] The powers granted to a school committee by § 16-2-9(a)(1)-(25), including the authority to adopt personnel policies, is limited by the employees' right to collective bargain.See § 16-2-9(b) ("nothing in this section shall be deemed to limit or interfere with the rights of teachers and other school employees to collectively bargain pursuant to chapters 9.3 and 9.4 of title 28 or to allow any school committee to abrogate any agreement reached by collective bargaining"). Nonetheless, this Court notes that even if adopting a vacation policy was a provision requiring collective bargaining, "the right to organize and bargain collectively" does not include "superintendents, assistant superintendents, principals, and assistant principals, and other supervisors above the rank of assistant principal." Sec. 28-9.3-2. As such, § 16-2-9(b), which reserves certain school employees' right to collectively bargain on policies the school committee adopts, does not affect the instant analysis.
[14] At the time of Plaintiff's resignation the School Committee had already enacted several provisions of the 1997 Policy — namely abolishing the five-vacation-day per year carry-over, increasing all principals to at least twenty-five vacation days per year and "grandfathering" other principals with vacation accruals over twenty-five days.
[15] This Court's holding that a school committee's currently enacted policies are not wholly illusory does not dilute a school committee's authority to change its policies as necessary. This narrow holding only serves to preclude a school committee from arbitrarily ignoring a provision within a currently enacted policy, while enforcing other parts of the policy.
[16] Namely, the School Committee abolished the five-vacation-day per year carry-over, increased all principals to at least twenty-five vacation days per year and "grandfathered" other principals with vacation accruals over twenty-five days.
[17] This Court notes that even assuming, arguendo, that Moretti had been granted actual authority by the School Committee to make promises to Plaintiff, the record does not demonstrate Plaintiff detrimentally relied on any of Moretti's statements. Plaintiff did not tender his letter of resignation to his former employer, Pilgrim High School, until October 20, 1994. (Ex. 6.) This submission was two days after he had learned of the terms publicly accepted by the School Committee at the October 18, 1994 School Committee meeting. (Ex. 4.)
[18] The Town argues that Plaintiff's tort claims are barred by the three-year statute of limitations of G.L. 1956 § 9-1-25. Rule 8(c) of the Superior Court Rules of Civil Procedure provides in part: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of limitations. . . ." Our Supreme Court has stated, "The failure to plead this affirmative defense results in its waiver."Narragansett Elec. Co. v. Carbone,898 A.2d 87, 101 (R.I. 2006) (citing LaBounty v. LaBounty,497 A.2d 302, 305 (R.I 1985)). This Court finds that because the Town failed to plead the statute of limitations affirmative defense in its answer, this affirmative defense was waived. Though the Town did affirmatively plead failure to state a claim upon which relief can be granted, accord and satisfaction, estoppel, failure of consideration, illegality, laches, payment, release, and waiver, it framed its argument over the timeliness of Plaintiff's tort claims in terms of statute of limitations, an affirmative defense that it waived. Merely stating those affirmative defenses without further argument, requires no further examination by this Court.See Wilkinson v. State Crime Lab. Comm.,788 A.2d 1129, 1132 n. 1 (R.I. 2002) (establishing that simply stating an issue on appeal without meaningful discussion or briefing constitutes a waiver of that issue because it does not assist the court in focusing on the legal question).